[This decision has been published in *Ohio Official Reports* at 96 Ohio St.3d 94.]

THE STATE OF OHIO, APPELLEE, *v*. CASSANO, APPELLANT.

[Cite as *State v. Cassano*, 2002-Ohio-3751.]

*Criminal law—Aggravated murder of cellmate in correctional institution—Death penalty upheld, when.*

(No. 1999-1268—Submitted April 23, 2002—Decided August 7, 2002.)

APPEAL from the Common Pleas Court of Richland County, No. 98-CR-171H.

_____

PFEIFER, J.

{¶1} On October 17, 1997, inmate Walter Hardy moved into a cell at Mansfield Correctional Institution ("MANCI") and became the cellmate of appellant August A. Cassano. Despite complaints by Cassano, authorities did not remove Hardy from the cell. On October 21, 1997, at about 2:30 a.m., Cassano killed Hardy by stabbing him approximately seventy-five times with a shank (prison-made knife). A jury convicted Cassano of aggravated murder. Cassano was sentenced to death.

Facts

Prior Events

{¶2} Cassano was serving time at MANCI because he had been convicted of aggravated murder in Summit County on May 25, 1976.

{¶3} On January 31, 1992, five years before he killed Hardy, Cassano stabbed inmate Troy Angelo inside Angelo's locked prison cell. Cassano had tied a shank to his hand with a shoestring and had stabbed Angelo approximately thirty-two times in the face, neck, chest, back, arms, head, and hand. Angelo escaped when a correctional officer opened the cell door. As Cassano was being led away, he looked at Angelo and said, "I hope you die." On November 6, 1992, Cassano was convicted of felonious assault for stabbing Angelo.

**{¶4}** Inmate Gerald Duggan testified that when Cassano became his cellmate in 1996, Cassano had told him that "if [Duggan] ever snitched on him he'd kill [him]." Duggan also said that Cassano "liked a lot of time in the cell by himself" and that Duggan had requested a night job to accommodate Cassano. Cassano had told Duggan that he didn't fight anymore, he stabbed. On September 18, 1997, Cassano reminded Juanita Murphy, a case manager, that he "had stabbed an inmate in 1992 and that that was why he had been sent to Lucasville."

The Killing

**{¶5}** On the morning of October 17, 1997, Cassano sent a written message to Unit Manager Ted Harris, noting that he did not have a cellmate and that he wanted Alfred Gibson to be his cellmate. Harris denied this request. Cassano had not received Harris's written reply when he stabbed Hardy.

**{¶6}** On the afternoon of October 17, Hardy moved into Cassano's cell. Hardy and others had been in the segregation unit for two days under suspicion of possessing a shank, but Hardy had been exonerated. Inmates described Hardy as weak, even though he became paranoid when he used drugs.

**{¶7}** According to Ollie King, a MANCI sergeant/counselor, Cassano was very upset about having Hardy as his cellmate. On October 17, Cassano told King that "he didn't want that snitching ass faggot in his cell and that we better check [Cassano's] record." King told him to send a message to Ted Harris, the unit manager. Cassano's friend, inmate Michael Cruz, agreed that Cassano was "very angry" about having Hardy as his cellmate. He also stated that Cassano had told authorities, "You just can't put any type of motherfucker in my cell, * * * check my record."

**{¶8}** After Hardy moved in, Cruz remarked to Cassano that he had a new cellmate. Cassano replied, "Not for long." That same day, Cassano told Duggan that when Cassano had been in Lucasville, prison authorities would not assign him a cellmate unless it was absolutely necessary.

2

{¶9} Cassano became very upset when Hardy broke a TV cable outlet. On October 18, Cassano told inmate James Pharner that Hardy "was driving him nuts, that [if] Harris didn't move [Hardy] out [of] the cell, that he would * * * remove him himself."

{¶10} On October 21, 1997, at 2:25 a.m., Donald Oats, a MANCI correctional officer, noted that all was quiet. He recalled that the two inmates in Cassano's cell had been in their bunks doing nothing unusual. Around 2:35 a.m., upon hearing a commotion, Oats hurried to Cassano's cell. He saw two inmates fighting and ordered them to stop. He also signaled a "man down" alarm and went to call for help. Oats heard Hardy yelling, "[Cassano] has a knife and he's * * * trying to kill me." When Oats looked into the cell, Cassano was standing over Hardy and stabbing him with a shank.

{¶11} Oats yelled and banged on the cell door and ordered Cassano to stop. Twice, Cassano looked at the light Oats shined on him and then "went right back to sticking inmate Hardy." Cassano continued to stab Hardy "hot and heavy, except for the two times that he looked at [Oats] for a second or two." Cassano never said anything, but Hardy was "pleading for help." Cruz heard Hardy screaming, "[L]et me out, * * * he's killing me, he's stabbing me."

{¶12} Corrections officers James Miller and Dwight Ackerman responded to the "man down" alarm within a minute. Ackerman looked into the cell, saw Cassano bent over "assaulting the other inmate," and ordered him to stop. Cassano stood up, and Ackerman saw that Cassano had a shank in his right hand. Cassano then continued stabbing Hardy. Miller ordered Cassano to stop, but Cassano "didn't look at [Miller.] He looked down and plunged a weapon into inmate Hardy."

{¶13} Although unarmed, Oats opened the cell door and ordered Cassano to the back of the cell. Cassano obeyed that order; he continued to hold the shank, which was tied to his right hand by a laundry-bag string. Cassano "was trying to

untie it" but apparently had difficulty because his hand was covered with blood. Cassano wore a glove on his right hand.

{¶14} When Miller pulled Hardy out of the cell, Hardy told him, "I am not going to make it." Within three to five minutes of the alarm, MANCI nurses arrived and began to treat Hardy. Then Hardy was taken to a hospital, where he was pronounced dead at 3:37 a.m.

{¶15} Dr. Keith Norton, a pathologist, concluded that Hardy bled to death and that his collapsed lungs contributed to his death. Dr. Norton found approximately seventy-five knife wounds, including eight wounds to the head, nine to the neck, twenty-four to the back, fifteen to the chest, and various other wounds to the abdomen, hips, legs, arms, and hands. Any one of ten specific wounds could have caused Hardy's death, including several to the lungs and one that pierced the heart. Dr. Norton also found abrasions and scratches on Hardy's body. A toxicologist found cocaine residue in Hardy's urine but not the blood, which indicated use within the last twenty-four to forty-eight hours.

{¶16} In Cassano's cell, investigators found many bloodstains, including some on the top bunk sheets where Hardy slept. They also found a bloody right-hand glove on the floor and the unsoiled left-hand mate of that glove in a closed desk drawer that belonged to Cassano.

{¶17} Throughout that morning, Cassano made various unsolicited comments. As Cassano walked by Hardy after the attack, he asked, "Is he dead?" While in the TV room, Cassano told Miller, "[t]hey're going to have to check [Hardy] for internal injuries." At the clinic, Cassano asked if Captain Ben Rachel remembered him as "the one that had stabbed a guy thirty times" several years before.

{¶18} At 3:50 a.m., Wanda Haught, a nurse, examined Cassano at the MANCI clinic and found no injuries except red marks caused by handcuffs. Cassano stated that he was not injured but that his shoulder was tired. At 5:15 a.m.,

4

Haught noticed a superficial scratch on Cassano's left side that had not been present at 3:50 a.m.

{¶19} Cassano's pants, T-shirt, and tennis shoes had blood on them. Cassano asked investigators prior to his giving a blood sample, "What do you need my blood for, that's all his blood?" Cassano's blood tested negative for drugs and alcohol.

Events After The Killing

{¶20} In the spring of 1998, Cassano talked to inmate Pharner about Hardy's death. Cassano said that he had acted in self-defense but blacked out after stabbing Hardy eight times. Cassano stated that "Hardy was smoking crack and * * * jumping up and down on the bunk and it drove [Cassano] nuts and he just went off on him." Cassano said that he had received the shank from an inmate named Carpenter.

{¶21} In April 1998, Cassano asked Duggan "to testify that [Duggan] had seen Hardy with the knife that was used to kill him so that [Cassano] could plead self-defense." Duggan had never seen Hardy with a shank.

{¶22} At his trial, Cassano testified that he has been in prison since 1976 and that he preferred being quiet and alone in his cell. Cassano had no particular problems with Hardy as his cellmate, except when Hardy was irritable and paranoid because of drug use.

{¶23} According to Cassano, he and Hardy watched TV and showed each other family photographs on the evening before Hardy was killed. Hardy had smoked crack cocaine that evening. Around 2:30 a.m., when Hardy briefly got up, he showed Cassano a knife and asked him what he thought about it. In response, Cassano "snatched it out of his hand" and told him the knife was "going out the window." Cassano stated that Hardy then grabbed him by the left shoulder, hit him in the face, and kneed him in the groin.

**{¶24}** Cassano stated that Hardy retrieved the knife and said, "This is for you." Cassano reclaimed the knife from Hardy, stabbed him once, and told him to settle down. However, according to Cassano, Hardy kept coming at him, and Cassano "stabbed him approximately four times." Cassano testified that he believed that he was in danger as long as Hardy kept attacking him. Hardy also tried to hit Cassano with a chair. According to Cassano, "after the last time that [Hardy] attacked * * *, [Cassano] totally * * * lost it." Cassano said that when the guard opened the cell door, he dropped the knife. Cassano denied that the knife had been tied to his wrist, that he had worn a glove on his right hand, that he had "sneak-attacked" Hardy, or that he had planned to kill Hardy. Cassano denied that he had continued to stab Hardy when the corrections officers arrived outside the cell. Cassano also denied that he had made some of the statements that other inmates or prison officials had attributed to him related to Hardy.

**{¶25}** During cross-examination, Cassano stated that while in prison, he had been in over one hundred fights and that he had stabbed four people. Cassano admitted writing various letters to his family, including one letter stating that he would never "have to worry about having a cellmate ever again."

**{¶26}** Inmate Charles Pool testified for the defense and claimed that he sold the murder weapon to Hardy and another inmate in May or June 1997. Inmate Howard Watson testified that Hardy once held an ice pick to his throat and threatened him when Hardy discovered Watson in his cell.

**{¶27}** Mary Hardy, the victim's mother, testified that she had sent her son $7,100 in money orders during his four years in prison and that they had talked on the phone every day. She stated that Hardy was up for parole in November 1997 and had been trying to behave himself. Sally Glover, the unit manager at MANCI, had moved Hardy into Cassano's unit for safety reasons. In his year at MANCI, Hardy had made sixteen cell moves and a total of forty-nine in the previous four years.

6

{¶28} In rebuttal, the state presented testimony from two MANCI officials, Juanita Murphy and Joseph Henderson. Murphy claimed that Cassano asserted that he had "blacked out" but had killed Hardy in self-defense. According to Murphy, Cassano also claimed that Hardy died because nurses had failed to cover the puncture wounds in his lungs. Henderson, the food service manager at MANCI, had tried, at Hardy's urging, to get Hardy moved out of Cassano's cell.

{¶29} A grand jury indicted Cassano for the aggravated murder of Walter D. Hardy with prior calculation and design. There were two death-penalty specifications. The first alleged that "the offense was committed while [Cassano] was a prisoner in a detention facility." RC. 2929.04(A)(4). The second alleged that Cassano, "prior to [this] offense, * * * was convicted of * * * Aggravated Murder." R.C. 2929.04(A)(5). The jury convicted Cassano as charged and recommended the death penalty. The trial court sentenced Cassano to death. The cause is now before this court upon an appeal as of right.

{¶30} In his appeal, Cassano advances fourteen propositions of law. We have reviewed each and have determined that none justifies reversal of Cassano's conviction or death sentence. We have also independently weighed the aggravating circumstances against the mitigating factors and reviewed the death penalty for appropriateness and proportionality, as required by R.C. 2929.05(A). For the reasons that follow, we affirm Cassano's conviction and death sentence.

Preliminary Issues: Self-representation

{¶31} In proposition of law I, Cassano argues that the trial court erred because it refused his request to represent himself "without making an in depth inquiry into Cassano's competency and ability to waive his right to appointed counsel."

{¶32} We have recognized that "a defendant in a state criminal trial has an independent constitutional right of self-representation and * * * may proceed to defend himself without counsel when he voluntarily, and knowingly and

intelligently elects to do so." *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus, citing *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. If a trial court denies the right to self-representation, when properly invoked, the denial is per se reversible error. *State v. Reed* (1996), 74 Ohio St.3d 534, 660 N.E.2d 456, citing *McKaskle v. Wiggins* (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. To establish an effective waiver of the right to counsel, "the trial court must make sufficient inquiry to determine whether [the] defendant fully understands and intelligently relinquishes that right." *Gibson*, 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph two of the syllabus.

{¶33} Following his indictment, Cassano filed several pro se motions, including a waiver of counsel, on May 14, 1998. That same day, he also asked that appointed counsel, Robert Whitney and Bernard Davis, be dismissed and that Kort Gatterdam of the Ohio Public Defender's Office be appointed as counsel. Thereafter, Whitney and Davis withdrew, and the court appointed the State Public Defender as counsel and Douglas Sexton as local counsel.

{¶34} On September 25, 1998, Cassano filed a pro se motion requesting "hybrid" legal representation consisting of himself and Gatterdam. At a hearing that day, Cassano asserted, "I have a right to be co-counsel with my attorneys." The court responded, "I can't allow you to represent yourself. * * * I'm willing to look into that further, but at this point we're going to proceed with these gentlemen."

{¶35} Following lengthy hearings on April 23, 1999, Cassano queried, "Is there any possibility I could represent myself? I'd like that to go on record." The trial court replied that it would not be in Cassano's best interest to represent himself.

{¶36} In response, the prosecutor stated that Cassano is "essentially asking that the case be continued so that [another of Cassano's attorneys] would have a chance to prepare more." Sexton and Gatterdam stated that they were fully

prepared for trial. Sexton and Gatterdam also stated that Andrew Love was lead counsel and that he had not had much time to prepare the case for trial, though he would be present at the start of the trial. The court stated that voir dire would start on Monday, but if "additional time is needed and it can be justified, [the court] can certainly consider that." Cassano proceeded to trial represented by counsel and did not again mention that he wanted to represent himself.

{¶37} We reject Cassano's claim that his rights of self-representation were violated. Cassano's initial demand to represent himself focused on hybrid representation. Cassano's only written motion on that point was made in September 1998 and related solely to hybrid representation. Cassano did not mention that he wanted to represent himself alone until April 23, 1999, only three days before the start of the trial. "A defendant has no right to a 'hybrid' form of representation wherein he is represented by counsel, but also acts simultaneously as his own counsel." *State v. Keenan* (1998), 81 Ohio St.3d 133, 138, 689 N.E.2d 929, citing *McKaskle*, 465 U.S. at 183, 104 S.Ct. 944, 79 L.Ed.2d 122.

{¶38} Cassano did not unequivocally and explicitly invoke his right to self-representation, even on April 23, 1999. "The constitutional right of self-representation is waived if it is not timely and unequivocally asserted." *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888. See, e.g., *Reese v. Nix* (C.A.8, 1991), 942 F.2d 1276, 1281 ("I don't want no counsel then" was not a clear and unequivocal pro se demand requiring *Faretta* inquiry); *United States v. Frazier-El* (C.A.4, 2000), 204 F.3d 553, 558 (assertion of the right of self-representation "must be * * * clear and unequivocal").

{¶39} We find that Cassano's April 23, 1999 statement was not an explicit and unequivocal demand for self-representation. Accordingly, the court did not deny his right to self-representation.

{¶40} We also find that Cassano's request was untimely because it was made only three days before the trial was to start. See, e.g., *United States v.*

*Mackovich* (C.A.10, 2000), 209 F.3d 1227, 1237 (requests made six to ten days before trial "were merely a tactic for delay"); *United States v. George* (C.A.9, 1995), 56 F.3d 1078, 1084 (request made on eve of trial untimely); *United States v. Frazier-El*, 204 F.3d at 560 (the "right does not exist * * * to be used as a tactic for delay").

{¶41} Cassano was represented for over ten months by the same counsel. In that time, he did not ask that those counsel be discharged so that he could proceed alone and without counsel. Cassano referred to self-representation on April 23 only in the context of supporting his last-minute request for delay. We conclude that Cassano made this remark about representing himself as an attempt to delay the trial.

{¶42} Finally, we conclude that Cassano abandoned any intention to represent himself when he did not pursue the issue of self-representation after the court told him it would not be a good idea. See *McKaskle*, 465 U.S. at 182, 104 S.Ct. 944, 79 L.Ed.2d 122 (defendant can waive his right to self-representation by allowing counsel to participate in trial). Accord *Wilson v. Walker* (C.A.2, 2000), 204 F.3d 33, 38 (failure to reassert a desire to proceed pro se constituted a waiver). For the foregoing reasons, we reject proposition of law I.

Trial Issues

Other Acts Evidence

{¶43} In proposition of law II, Cassano argues that the trial court erred and that he was unfairly prejudiced when it admitted evidence showing Cassano's criminal propensity. Cassano particularly complains about evidence that he stabbed inmate Troy Angelo in 1992.

{¶44} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's propensity toward criminal behavior. "It may, however, be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The exception

allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶45} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Thus, we review the trial court's decision on an abuse-of-discretion standard. See *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233; *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126. We conclude that the trial court did not abuse its discretion in admitting the evidence relating to the stabbing of Angelo. That evidence helped to establish "prior calculation and design," a key element of the aggravated murder charge against Cassano.

{¶46} Cassano mentioned his record to prison authorities several times in an attempt to dissuade prison authorities from assigning a cellmate to him. Evidence about the attack against Angelo explains the significance of Cassano's remarks about his record. In short, Cassano's own demands that prison officials check his record made evidence of his assault against Angelo relevant in his trial.

{¶47} Moreover, that evidence was otherwise relevant to Cassano's "motive" and his "plan" within the context of Evid.R. 404(B). The attacks on Angelo and Hardy were similar. In both cases, Cassano was angry at an inmate and stabbed the inmate in a locked cell, using a shank tied to his wrist by a string. In both assaults, Cassano repeatedly stabbed the inmate predominantly in the face, head, neck, chest, and back.

{¶48} Finally, we conclude that the evidence of the assault on Angelo was harmless and that Cassano's substantial rights were not prejudiced. At trial, Cassano testified that he had been in over one hundred fights in prison and had stabbed four people. Thus, the jury would have known about Cassano's criminal behavior.

**{¶49}** Moreover, we find that the evidence of Cassano's guilt was overwhelming. While in a locked prison cell, Cassano stabbed his cellmate approximately seventy-five times, using a knife tied to his wrist, and then attempted to claim self-defense. That Cassano was the killer was proven beyond a reasonable doubt.

**{¶50}** Cassano also complains that Angelo introduced evidence of other criminal acts that Cassano had committed. Angelo disclosed that in 1992, Cassano used drugs and made sexual proposals to Angelo. This evidence formed part of Angelo's explanation about the motive for the assault. Although we find that evidence to be of questionable relevance, Cassano either failed to object to the evidence at trial or his counsel elicited the evidence on cross-examination. No plain error occurred.

**{¶51}** Since the trial court did not err in admitting the "other acts" evidence in the trial phase, the jury could properly consider it during the penalty phase. The evidence related to Cassano's "history, character, and background," which a jury must consider in the penalty phase. R.C. 2929.04(B). See, e.g., *State v. Waddy* (1992), 63 Ohio St.3d 424, 428, 588 N.E.2d 819. We reject proposition of law II.

Restraints During Trial

**{¶52}** In proposition of law III, Cassano argues that the trial court abused its discretion by directing that his feet be shackled during the trial without making "findings or conduct[ing] an evidentiary hearing." Before trial, Cassano, through counsel, asked to appear at all hearings without restraints. At a hearing on April 1, 1999, the parties argued the issue. The state presented a summary of Cassano's prison record that reflected multiple threats to other inmates and a significant amount of fighting. The defense did not offer contrary evidence. On April 21, the court ordered that Cassano be restrained with leg shackles. On April 23, the court ordered that counsel tables be skirted so that the shackles would not show.

**{¶53}** At the start of trial on April 26, 1999, the defense suggested that despite the skirting, the jurors might be able to discern that Cassano was shackled. The court responded that shackles were necessary because Cassano had a history of violent crime and that he might attempt to "bolt through that door." Later, the court recognized that jurors might have glimpsed the leg shackles.

**{¶54}** We have stated that "no one should be tried while shackled, absent unusual circumstances." *State v. Kidder* (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311. "However, shackling is left to the trial court's sound discretion." *State v. Richey* (1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, citing *State v. Woodards* (1966), 6 Ohio St.2d 14, 23, 35 O.O.2d 8, 215 N.E.2d 568. See, e.g., *Woodards v. Cardwell* (C.A.6, 1970), 430 F.2d 978, 982 (trial court must exercise its own discretion and not leave the issue up to security personnel). Several courts have upheld the use of restraints in trials. See, e.g., *Harrell v. Israel* (C.A.7, 1982), 672 F.2d 632; *Kennedy v. Cardwell* (C.A.6, 1973), 487 F.2d 101; *State v. Curry* (Sept. 30, 1997), Scioto App. No. 95CA2339, 1997 WL 600056; *State v. Bell* (June 6, 1997), Scioto App. No. 96CA2472, 1997 WL 317425.

**{¶55}** In this case, Cassano has not demonstrated that the trial court abused its discretion in directing that his legs be shackled. Both of Cassano's hands were free throughout the trial. Moreover, the court held a hearing and considered the evidence presented, i.e., Cassano's prison record, before finding that unobtrusive leg shackles, hidden by a skirt, were necessary. Cassano's prior convictions, his status as an inmate in a maximum security prison, and his documented history of violence even while in custody combine to convince us that the trial court did not abuse its discretion in requiring Cassano to be shackled.

**{¶56}** Moreover, jurors knew that Cassano was an inmate and a convicted murderer, and they might have expected to see him restrained during his court appearances. Cassano never asked for a cautionary jury instruction on the issue. Thus, as to an instruction, he waived all but plain error, which is not present. The

fact that Cassano was tried while wearing hidden leg shackles did not deprive him of a fair trial even though jurors might have been able to discern the shackles. See, e.g., *Harrell*, 672 F.2d at 637; *Fountain v. United States* (C.A.7, 2000), 211 F.3d 429, 435-436. We reject proposition of law III.

Rejection of Defense Challenge of Juror

**{¶57}** In proposition of law IV**,** Cassano argues that the trial court erred in rejecting a defense challenge for cause against juror Wendy White, who was later removed by a defense peremptory challenge. Cassano argues error because White's husband had been a MANCI correctional officer, because White favored the death penalty and thought the judicial process was too slow, and because she did not "think it would be fair" for her to sit on a jury.

**{¶58}** Defendants are entitled to fair trials, an essential part of which is " 'a panel of impartial, "indifferent" jurors.' " *Murphy v. Florida* (1975), 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589, quoting *Irvin v. Dowd* (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. However, trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323. " 'Deference must be paid to the trial judge who sees and hears the juror.' " *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841. Thus, a "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *Tyler*, 50 Ohio St.3d at 31, 553 N.E.2d 576. Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646.

**{¶59}** In this case, the trial court could have sustained the challenge, but we conclude that the failure to do so was not an abuse of discretion. White's concern about fairness was based on her husband's employment and concern about possible "repercussions" to her husband if she sat on the jury. However, White noted that her husband had been assigned to another facility and no longer worked at MANCI.

She also stated that her husband's employment would not "taint [her] view * * * of the evidence."

{¶60} Moreover, White acknowledged that she knew nothing about the case except that someone had been stabbed to death. She agreed to consider the defendant's background, if relevant, and also whether the victim had done anything to cause his own death. She stated that she would be fair to both sides, keep an open mind, and consider all options. She also stated that she would follow the court's instructions and would not automatically vote for the death penalty. Since White was qualified as a juror and agreed to be fair and follow instructions, we find no abuse of discretion by the trial court. Cf. *Williams*, 79 Ohio St.3d at 5, 679 N.E.2d 646; *State v. Rogers* (1985), 17 Ohio St.3d 174, 179, 17 OBR 414, 478 N.E.2d 984. We reject proposition of law IV.

Public Trial

{¶61} In proposition of law V, Cassano argues that the trial court denied him his constitutional right to a public trial. During pretrial hearings on April 23, 1999, Cassano's counsel asked that a suppression hearing involving testimony about Cassano's felonious assault of Angelo be closed to the public to avoid prejudicial pretrial publicity. The prosecution did not object, and the court granted Cassano's request. After five witnesses testified, the in-camera stage ended. The court noted that the media could reenter; whether the doors were reopened is not on the record. After a few other matters were discussed, the hearing ended.

{¶62} We have long recognized that "the right to a public trial * * * is a fundamental guarantee of both the United States and Ohio Constitutions." *State v. Lane* (1979), 60 Ohio St.2d 112, 14 O.O.3d 342, 397 N.E.2d 1338, paragraph two of the syllabus. Moreover, "the right to a public trial * * * extends to pretrial proceedings." *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger* (1986), 28 Ohio St.3d 418, 421, 28 OBR 472, 504 N.E.2d 37. Accord *State*

*ex rel. Dispatch Printing Co. v. Lias* (1994), 68 Ohio St.3d 497, 502, 628 N.E.2d 1368.

{¶63} In *Press-Enterprise Co. v. Superior Court of California for Riverside Cty.* (1986), 478 U.S. 1, 13-14, 106 S.Ct. 2735, 92 L.Ed.2d 1, the Supreme Court of the United States noted that under the First Amendment, a preliminary hearing could not be closed (even at the defendant's request) "unless specific, on the record findings * * * demonstrat[e] that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest,' " citing *Press-Enterprise v. Superior Court of California, Riverside Cty.* (1984), 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629. In *Waller v. Georgia* (1984), 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.2d 31, the United States Supreme Court held that the *Press-Enterprise* standards requiring strict justification for closure applied to pretrial suppression hearings.

{¶64} In this case, we conclude that the trial court erred in closing the suppression hearing without conducting a separate hearing, making findings justifying such closure, and considering alternatives to closure. See *Waller*, 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31. However, reversal is not required because Cassano invited the error by requesting closure. "A party cannot take advantage of an error he invited or induced." *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408. Accord *State v. Murphy* (2001), 91 Ohio St.3d 516, 535, 747 N.E.2d 765 (accused "actively responsible" for error cannot complain).

{¶65} Moreover, closure did not affect the fairness, integrity, or public reputation of the trial. Cf. *United States v. Olano* (1993), 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508. The evidence received was later heard at the public trial. Even when a defendant objected to closure, reversal of the conviction was required only when a new public suppression hearing would result in suppression of material evidence not suppressed earlier. See *Waller*, 467 U.S. at 49-50, 104

S.Ct. 2210, 81 L.Ed.2d 31. Nothing in the record suggests that another hearing would affect the result in this case.

{¶66} Cassano also argues that the trial court remained closed after the in-camera hearing ended. The record is unclear about whether the court remained closed. Morever, any failure immediately to reopen the pretrial hearing was brief, inadvertent, and simply a continuation of the original invited error caused by Cassano. See, e.g., *Peterson v. Williams* (C.A.2, 1996), 85 F.3d 39, 43-44 (brief and inadvertent continuation of proper courtroom closing not noticed by participants did not violate Sixth Amendment); *United States v. Al-Smadi* (C.A.10, 1994), 15 F.3d 153, 154-155. We reject proposition of law V.

Accused's Absence From Jury View

{¶67} In proposition of law VI, Cassano argues that the trial court violated his due process rights by denying his request to be present at the jury view of the crime scene. Cassano does not claim that his counsel could not attend the view.

{¶68} Here, the trial court erred in denying Cassano his right to attend the jury view. The statute, R.C. 2945.16, specifies that "[t]he accused has the right to attend such view by the jury * * *." The trial court erred, even though the court acted as it did because of the complex logistical problems involved. The court stated that prison authorities objected to the probable duration of the jury view. Further, the court expressed concern that the prison would have to be locked down, and Cassano would have been unshackled in his cell during the jury view. While the trial court's concern is understandable, R.C. 2945.16 does not grant the court any discretion.

{¶69} Nonetheless, the trial court's decision refusing to allow Cassano to be present at the jury view did not deprive Cassano of due process. In *Snyder v. Massachusetts* (1934), 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674, the United States Supreme Court held that denial of a defendant's presence at a jury view did not violate due process. The *Snyder* court recognized that "the presence of a

defendant [in a felony prosecution] is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder*, 291 U.S. at 107-108, 54 S.Ct. 330, 78 L.Ed. 674, overruled on other grounds, *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. Other courts have also rejected due process complaints when an accused did not attend a jury view of a crime scene within prison walls. See, e.g., *Devin v. DeTella* (C.A.7, 1996), 101 F.3d 1206; *Jordan v. State* (1981), 247 Ga. 328, 346, 276 S.E.2d 224, reversed on other grounds, *Jordan v. Lippman* (C.A.11, 1985), 763 F.2d 1265.

{¶70} Finally, the court's refusal to allow Cassano to attend the jury view did not materially prejudice Cassano. We have recognized that the jury's "view of a crime scene is neither evidence nor a crucial stage in the proceedings." *Richey*, 64 Ohio St.3d at 367, 595 N.E.2d 915, citing *Tyler*, 50 Ohio St.3d at 38, 553 N.E.2d 576. See, also, *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585; *State v. Sanders* (2001), 92 Ohio St.3d 245, 265, 750 N.E.2d 90. We also note that the trial court authorized Cassano, his counsel, and any agent to view the crime scene before trial. Cassano has failed to show that his due process rights were violated or that he suffered prejudice because of the court's refusal to allow him to attend the jury view. We reject proposition of law VI.

Trial-phase Instructions on Self-defense

**{¶71}** In proposition of law VII, Cassano argues that his prison cell was equivalent to his home and that therefore the trial court erred in instructing the jury that Cassano had a duty to retreat if attacked. The court instructed the jury, over defense objection, that self-defense could be valid only if Cassano had not violated a duty to retreat. Further, the court instructed that Cassano "had a duty to retreat if, A, the defendant was at fault in creating the situation giving rise to the event which caused the death of Walter Hardy; or B, the defendant did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from the danger was the use of deadly force."

**{¶72}** As we recently recognized in *State v. Barnes* (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240, "To establish self-defense, a defendant must prove * * * (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." Id., 94 Ohio St.3d at 24, 759 N.E.2d 1240, citing *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus.

**{¶73}** In *State v. Williford* (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279, paragraph two of the syllabus, we held, "There is no duty to retreat from one's home." Further, in *State v. Jackson* (1986), 22 Ohio St.3d 281, 284, 22 OBR 452, 490 N.E.2d 893, we stated that the "elements of self-defense are cumulative. * * * If the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.)

**{¶74}** We conclude that in this case, the trial court erred in instructing on a duty to retreat. Cassano was obligated by law and prison regulations to occupy the cell that he did. Moreover, retreat from his locked prison cell, which was seven and a half feet by ten feet, was never an option for Cassano. Thus, the trial court should not have instructed on a duty to retreat because retreat was impossible under the circumstances.

**{¶75}** Nonetheless, Cassano suffered no material prejudice. Even under Cassano's version of events, Hardy never threatened him with the shank, but simply showed it to him. Cassano became the aggressor by taking the shank away. Then, according to Cassano, Hardy hit him and kneed him. We conclude that Cassano was at fault in creating the situation leading to the affray.

**{¶76}** The facts also show that Cassano had no basis for a "bona fide belief that he was in imminent danger of death or great bodily harm" and could "escape from such danger" only by using deadly force. *Robbins*, 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph two of the syllabus. Even under Cassano's version, when he stabbed Hardy, Hardy had no weapon. Once Cassano retrieved the shank and held it in his hand, he was not in danger. Cassano could have shoved the shank under the cell door out into the hallway, as he later did in response to orders from the corrections officers, or simply maintained control of the shank.

**{¶77}** Third, Cassano repeatedly stabbed Hardy after Hardy had ceased to pose any conceivable threat to Cassano. Cassano continued the attack even after the correctional officers were at the cell door and ordered him to stop. Under these facts, Cassano was not prejudiced by the trial judge's instruction on the duty to retreat. Cf. *Jackson,* 22 Ohio St.3d 281, 284, 22 OBR 452, 490 N.E.2d 893. No reasonable jury could have believed that Cassano acted in self-defense. Cf. *State v. Palmer* (1997), 80 Ohio St.3d 543, 564, 687 N.E.2d 685. Proposition of law VII lacks any merit.

Sufficiency of Evidence

20

{¶78} In proposition of law VIII, Cassano challenges the sufficiency of the evidence to prove prior calculation and design. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶79} No bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' " *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82. Yet " 'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' * * * required under prior law." *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus. "Instantaneous deliberation is not sufficient * * *." *Cotton*, paragraph two of the syllabus. " '[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.' " *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, quoting *Cotton*, 56 Ohio St.2d at 11, 10 O.O.3d 4, 381 N.E.2d 190.

{¶80} In this case, there is ample evidence of prior calculation and design. Cassano made several statements about what he might do to Hardy. He told prison authorities that he would take matters into his own hands if Hardy was not moved. Cassano told Sgt. King that "he didn't want that snitching ass faggot in his cell and that we better check his record." Cruz testified that Cassano was very angry about Hardy's presence in his cell and that Cassano said that Hardy would not be there "for long." After Hardy broke the cable outlet, Cassano stated that he would kill Hardy. Cassano also said that if Hardy was not moved, he would "remove [Hardy] himself."

{¶81} The nature of the attack also suggests that it was the result of prior calculation and design. The jury could reasonably find that Cassano's assault was

a sneak attack, carried out while Hardy slept in the top bunk. When he stabbed Hardy, Cassano was already fully dressed and had already packed his bags to move. Moreover, the shank was so securely tied to Cassano's wrist that removing it took some time. Cassano's right hand was gloved, enabling him to better hold the knife.

{¶82} The approximately seventy-five wounds that Cassano inflicted on Hardy required considerable time to inflict. Three correctional officers arrived while Cassano was still stabbing Hardy. They ordered Cassano to stop; he continued stabbing Hardy, further indication of his determination to carry out his plan to kill Hardy.

{¶83} Finally, Cassano admitted to Pharner that he had brought the knife into the cell. The fact that the knife was tied to Cassano's wrist supports that admission.

{¶84} All of these facts demonstrate strong evidence of prior calculation and design. Cf. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 334, 703 N.E.2d 1251; *State v. Palmer* (1997), 80 Ohio St.3d at 568, 687 N.E.2d 685; *State v. Taylor* (1997), 78 Ohio St.3d at 20-21, 676 N.E.2d 82. We reject Cassano's proposition of law VIII.

Penalty-phase Issues

Penalty-phase Instructions

{¶85} In proposition of law IX, Cassano raises issues concerning the penalty-phase instructions and argues that his constitutional rights were violated. However, Cassano requested a specific penalty instruction, which was given, and did not object to others given at trial. His failure to object "constitutes a waiver * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. We find that the trial court's penalty instructions involved no error, plain or otherwise.

**{¶86}** Cassano argues that the court's instructions failed to convey that a single juror could vote so as to require a life sentence. See *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030. Cassano complains because the court instructed the jury that "[w]henever all 12 of you agree upon your verdict, you will complete the verdict form, sign it in ink, and summons the bailiff." We conclude that this instruction was not misleading and that it was intended to inform the jurors that all of them had to sign the verdict form.

**{¶87}** The court instructed the jury, "You're not required to unanimously find that the State failed to prove that the aggravating circumstances outweigh the mitigating factors before considering one of the life sentence options. In other words, you should proceed to consider and choose one of the life sentence options if any one or more of you conclude that the State has failed to prove by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. A solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in this case do not outweigh the mitigating factors. * * * [A]ny one of these mitigating factors standing alone may be sufficient to support a sentence of life imprisonment." These instructions, given pursuant to a defense request, explicitly recognize that a solitary juror could preclude the imposition of the death penalty.

**{¶88}** The instructions indicated that "[t]he jury was free to consider a life sentence even if jurors had not unanimously rejected the death penalty." *State v. Taylor*, 78 Ohio St.3d at 29, 676 N.E.2d 82. Thus, unlike in *State v. Brooks,* 75 Ohio St.3d at 159, 661 N.E.2d 1030, the jury was not told that it had "to determine unanimously that the death penalty is inappropriate before you can consider a life sentence."

**{¶89}** In numerous cases, we have rejected similar complaints that a trial court's instructions violated *Brooks*. Cf. *State v. Stallings* (2000), 89 Ohio St.3d 280, 294, 731 N.E.2d 159; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 395, 721

N.E.2d 52; *State v. Davis* (1996), 76 Ohio St.3d 107, 118, 666 N.E.2d 1099. We find that Cassano's complaint on this point lacks merit.

{¶90} Cassano complains that the trial court did not sua sponte instruct that a jury's verdict of a life sentence would be binding on the court. However, Cassano never asked for such an instruction and cannot complain absent plain error. We conclude that the court's failure to instruct was not plain error. See *State v. Keith* (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47 (decision not to inform "jury of the binding nature of the life sentence recommendation does not constitute plain error").

{¶91} Cassano argues that the court "improperly instructed the jury as to the effect of their verdict should it be a life option." The trial court told the jurors that if they found that the state had not proved that the aggravating circumstances outweighed the mitigating factors, "then [they] will decide what the penalty should be" from among the life sentence options. The court's instruction was not error.

{¶92} Cassano argues that the trial court's instructions misled the jury as to the importance of their verdict. The trial court instructed the jury that the sentence verdict "is more than a recommendation. You are the trier of fact in this case. * * * You should approach your task with the utmost seriousness, because your weighing of the evidence is unlikely to be disturbed. You should expect your sentence verdict * * * to be carried out."

{¶93} The court's instruction accurately reflects Ohio law and does not diminish the jury's overall sense of responsibility. *State v. Henderson* (1988), 39 Ohio St.3d 24, 29-30, 528 N.E.2d 1237; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75. Moreover, the court's strongly worded admonition to the jury as to the importance of its verdict reinforced the jury's sense of the importance of its responsibility. See, e.g., *State v. Mills* (1992), 62 Ohio St.3d 357, 375, 582 N.E.2d 972. We reject Cassano's proposition of law IX.

Prosecutorial Misconduct

{¶94} In proposition of law X, Cassano argues that this court should vacate his death sentence because the prosecutor "diminish[ed] the severity of a life option by arguing that the law or policy may change which would allow the defendant to be released at an earlier date."

{¶95} Whether a prosecutor's remarks constitute misconduct requires analysis as to (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected a substantial right of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. See *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶96} Initially, we evaluate Cassano's complaints of prosecutorial misconduct in the context of the unconventional defense penalty-phase evidence. Cassano presented testimony from Sandra Schafer, an inmate records supervisor at MANCI who calculates inmate sentences. Schafer testified that if Cassano were to receive the minimum sentence (life with possible parole after 25 years), he would be ineligible for parole until the year 2024. According to Schafer, the Parole Board normally rejects first-time parole for an inmate convicted of aggravated murder. She also stated that the Parole Board can continue to reject parole indefinitely for someone with a life sentence. During cross-examination, Schafer asserted without defense objection that current law could change and thereby allow good time or parole consideration before the years 2024 or 2029 (for a minimum 30-year sentence). Schafer also stated that parole boards are governed by regulations, not law, and therefore could grant parole when an inmate first becomes eligible.

{¶97} Additionally, Todd Ishee, a MANCI deputy warden, testified about conditions at the Ohio State Penitentiary ("OSP"), a super maximum security facility where Cassano was then confined. At OSP, inmates are locked down in single cells for twenty-three hours a day, are restricted from direct contact with

other inmates, and are under heavy guard and restraint when not in their cells. OSP inmates pose little risk to others. On cross-examination, Ishee agreed without objection that OSP came into existence after the Lucasville riot.

{¶98} Cassano challenges the propriety of the prosecutor's cross-examination of Schafer that the laws governing sentencing could change and that policy governing parole release might change. However, Cassano did not object and thereby waived all but plain error. Of course, a prosecutor should not speculate in argument on the "possibility of escape, commutation, and pardon." *State v. Evans* (1992), 63 Ohio St.3d 231, 238, 586 N.E.2d 1042. However, in this case, the prosecutor was not speculating about future events but simply testing, by cross-examination, the foundation of Schafer's testimony.

{¶99} The prosecutor did not commit misconduct by asking Ishee about the reason OSP was built. Since Cassano relied heavily upon the strict conditions at OSP, where Cassano resided prior to trial, the state could cross-examine Ishee about the historical reasons behind those restrictions. Cross-examination "shall be permitted on all relevant matters," Evid.R. 611(B), and the scope of cross-examination is within the sound discretion of the trial court. *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916.

{¶100} Cassano complains about the prosecutor's final penalty argument. Here, the prosecutor noted that future events might require abandoning OSP's single-cell policy or might require transfer of some OSP inmates to other prisons. That argument rebutted defense counsel's argument that Cassano would be functioning in a single cell and that prison authorities could have prevented Hardy's death by housing Cassano alone. Further, the prosecutor's argument rebutted defense assertions that Cassano no longer represented a danger because he would be under close scrutiny at the OSP.

{¶101} A prosecutor can respond to issues raised by an accused. *State v. Awkal* (1996), 76 Ohio St.3d 324, 336, 667 N.E.2d 960; *State v. Lundgren* (1995),

73 Ohio St.3d 474, 491, 653 N.E.2d 304. Moreover, "[p]rosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292.

{¶102} Here, the state was not relying upon arguments about changes in the law or suggesting that Cassano might be released early. Instead, the prosecutor responded to Cassano's optimistic speculation that current conditions at the Ohio State Penitentiary would continue indefinitely. The trial court properly rejected Cassano's objection to that state argument.

{¶103} We reject proposition of law X.

Appropriateness of Death Penalty

{¶104} In proposition of law XI, Cassano argues that the death sentence is not appropriate as applied to him. We will consider these arguments during the independent sentence review.

Ineffective Assistance of Counsel

{¶105} In proposition of law XII, Cassano argues that his counsel provided ineffective assistance at trial. Reversal of convictions on ineffective assistance requires the defendant to show "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

{¶106} Cassano argues that his counsel were ineffective in failing to object to the court's self-defense instructions imposing a duty to retreat on Cassano. At trial, counsel objected to this instruction and preserved the issue. As previously discussed in connection with proposition of law VII, the self-defense instruction did not materially prejudice Cassano.

{¶107} Cassano complains that his counsel failed to object to penalty instructions relating to the verdict as a recommendation and the ability of a solitary juror to preclude the death penalty. In our discussion of proposition of law IX, we concluded that the trial court properly instructed the jury on those points in the penalty phase.

{¶108} Cassano suggests that counsel improperly moved to exclude the media from a suppression hearing. However, counsel was protecting Cassano's rights by trying to prevent public disclosure of "other acts" evidence that counsel hoped to suppress. Attempting to exclude the media under those circumstances represented a sound tactical choice by counsel. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, Cassano has failed to demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶109} Cassano asserts "numerous instances" of reported ineffectiveness but fails to cite examples other than those already discussed. Our review of the record does not disclose that counsel were constitutionally ineffective. Instead, the record reveals that Cassano's three lawyers fought diligently and competently throughout the proceedings to protect his rights. Cassano's claim that counsel were ineffective lacks merit. We reject proposition XII.

Settled Issues

Peremptory Challenges

**{¶110}** In proposition XIII, Cassano argues that the state improperly used peremptory challenges against jurors who were hesitant to impose the death penalty. However, prosecutors are not prohibited from using peremptory strikes against prospective jurors opposed to the death penalty. See *State v. Cook* (1992), 65 Ohio St.3d 516, 518, 605 N.E.2d 70; *Evans*, 63 Ohio St.3d at 249, 586 N.E.2d 1042. We summarily reject proposition XIII. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568.

Constitutionality

**{¶111}** We also summarily reject Cassano's proposition XIV challenging the constitutionality of Ohio's death penalty statute. *State v. Carter* (2000), 89 Ohio St.3d 593, 606, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *Poindexter,* 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Moreover, Cassano waived any international law challenge by not raising that issue before the trial court. *State v. Coley* (2001), 93 Ohio St.3d 253, 271, 754 N.E.2d 1129; *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus.

**INDEPENDENT SENTENCE EVALUATION**

Penalty-phase Evidence

**{¶112}** As previously noted, Sandra Schafer testified about the parole process and the remoteness of Cassano's chances for parole. Deputy Warden Ishee testified about the strict control over inmates at the Ohio State Penitentiary, where Cassano had resided.

**{¶113}** Carmella Tobias, Cassano's sister, stated that she was in poor health and cared for their parents, who were in very poor health. Tobias described Cassano as a good boy who had attended Catholic schools. Unfortunately, Cassano got in trouble, was sent to the Training Institute of Central Ohio ("TICO"), a youth

detention facility, and, when released, was "very angry." In 1976, Cassano was sent to prison in Lucasville but did not fare well when he shared a cell with other inmates. Tobias expressed her sorrow about what had happened to Hardy. She asked the jury to spare her brother's life.

{¶114} Tobias stated that she, her sister, Augustina Winland, and their brother, Frank Cassano, do not have criminal records and that their parents had tried hard to raise them correctly. She attributed the changes in Cassano's personality to the time he had spent in TICO. Tobias also stated that their father was an alcoholic and had been violent to their mother.

{¶115} Augustina Winland described Cassano as a good boy who liked baseball, fishing, and his pets. However, Cassano, like his father, had a temper. Their father did not show much affection for the children, and the family had financial difficulties because their father drank heavily and gambled.

{¶116} Winland loves her brother very much and has visited him frequently in various prisons. She expressed sorrow about what Cassano had done and expressed sympathy to the Hardy family. Winland stated her desire that Cassano not receive the death penalty.

{¶117} Dr. Clemons Bartollas, a professor of sociology anda Presbyterian minister, worked as a social worker at TICO when Cassano was an inmate. According to Dr. Bartollas, Cassano, then sixteen years old, did not belong at TICO, which housed "the most severe hard core delinquents" in Ohio. Cassano entered TICO "a desperate young man who was troubled." After being victimized at TICO, Cassano left as a bitter man with the life-long scars of a chronic victim. Cassano was "much more anti-social than when he came in."

{¶118} Dr. Bartollas claimed that the state made "serious mistakes" in dealing with Cassano, starting with placing him at TICO too soon. The state's second mistake was treating Cassano as dangerous rather than as troubled. Dr. Bartollas stated that Cassano's nine suicide attempts and hunger strikes were an

implicit cry for help. The state also made a mistake by not keeping Cassano in a single cell and by placing Hardy, a young, vulnerable inmate, in the same cell with Cassano, who was hardened by his years in prison. The "type of [Cassano's] victimization" and the state's cumulative errors "contributed to what happened in October of 1997." Dr. Bartollas believes that Cassano will do well at OSP, where he will have his own space.

{¶119} On cross-examination, Dr. Bartollas confirmed that Cassano had a juvenile record, including purse snatching at age ten and throwing an egg at a teacher at age thirteen. Cassano started fires in the home when he was five and eight years old. He also stated that Cassano had difficulty adjusting to school and that he had cut his sister with a pair of scissors. When Cassano was thirteen to fifteen, he used drugs and alcohol, and at age sixteen he was sent to TICO. Dr. Bartollas conceded that the aggravated murder Cassano committed in 1976 had nothing to do with prison conditions.

{¶120} Jody Devine, Cassano's girlfriend when they were teenagers, described Cassano as a nice young man who worked steadily when she knew him. He did not use drugs or engage in any illegal activity when she dated him. Cassano was never violent towards her. They kept in contact through letters while he was in prison. Devine asked the jury to please allow Cassano to live.

{¶121} In an unsworn statement, Cassano asserted that because he was deprived of freedom and love for twenty-three years, he had become "an unfeeling dehumanized person." He stated that "prison has made [him] hate with all [his] heart [and has] turned [him] into a cold-hearted person." Although "dehumanized and degraded," he stated that he had kept his pride, dignity, and morals. He "really and truly deeply loved" Jody, but otherwise his "heart is filled with hate."

{¶122} According to Cassano, his childhood was violent, and he grew up with "violence and more violence." As a youth, he got into many fights, even when he tried to avoid them. He began drinking and using drugs, including acid and

marijuana. However, he was always kind to pets and animals. Jody "tried to get [him] to go straight, but [he] didn't listen."

**{¶123}** In prison, he saw men raped and killed and also saw more drugs than on the street. At Lucasville, he started "using steel" rather than his hands in fights. He felt that he had no choice in dealing with inmates who "tried to harm [him] or tried to force [him] to be a punk." In prison, he fought and "won [his] respect" and would not join any gangs. In prison, he "was too honest for the convicts, [and] wasn't for no games, preying on the weak to get money or drugs." Cassano also believed that he should have been paroled a few years earlier. Drugs were his downfall, but he has not used drugs since his 1976 conviction.

**{¶124}** According to Cassano, Hardy would not "settle down" but "just kept attacking" Cassano. Cassano "tried to avoid it," and Hardy's death "was not [his] fault." Cassano wanted the jury to spare his life and expressed sorrow about Hardy's death.

*Sentence Evaluation*

**{¶125}** Specification one charged, and the jury found, that Cassano killed Hardy while Cassano was an inmate in a detention facility. R.C. 2929.04(A)(4). Specification two charged, and the jury found, that prior to this aggravated murder, Cassano had been convicted of a purposeful killing, aggravated murder, in Summit County on May 25, 1976. R.C. 2929.04(A)(5). After independent assessment, we conclude that both aggravating circumstances were proven beyond a reasonable doubt.

**{¶126}** The nature and circumstances of the offense offer no mitigating features. Although Cassano claimed self-defense and provocation, the evidence suggests a deliberate murder while Hardy lay on his top bunk, asleep. Moreover, Cassano repeatedly stabbed Hardy and did so in their locked prison cell from which Hardy could not escape.

**{¶127}** Cassano's history and background provide little mitigation. While Cassano's father likely drank excessively and shared little affection with his children, those facts offer minimal mitigation. Cassano's parents cared for him and provided food, clothing, schooling, and an atmosphere where he could grow and prosper. Cassano's siblings appear to have risen above whatever aspect of their family life was dysfunctional. Unfortunately, Cassano made a choice early in his life to live outside the law. Even after being institutionalized as a youth, he persisted in living a life of crime. His character offers no mitigation.

**{¶128}** We find no significant evidence of statutory mitigating factors R.C. 2929.04(B)(1) through (B)(6). As to "other factors," R.C. 2929.04(B)(7), we decline to grant any mitigating weight to the testimony of Dr. Bartollas, who faults the state for mistakes in dealing with Cassano. Cassano made deliberate choices in his life and must bear the consequences of those choices. We note that Cassano's family loves him, as does his childhood girlfriend, and they do not want him executed.

**{¶129}** After weighing each aggravating circumstance against the collective mitigating evidence, we conclude that each aggravating circumstance outweighs any mitigating factors beyond a reasonable doubt. Killing another while an inmate and having previously been convicted of aggravated murder are grave aggravating circumstances. Cassano by his acts has demonstrated that he is a menace to the life, health, and safety of others, even when he is in prison. We find the death penalty to be appropriate.

**{¶130}** Moreover, we find the death penalty to be proportionate when Cassano's offense is compared with other aggravated murders involving murders by inmates. See, e.g., *State v. Sanders* (2001), 92 Ohio St.3d 245, 750 N.E.2d 90; *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329; *State v. Carter* (1992), 64 Ohio St.3d 218, 594 N.E.2d 595; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585.

**{¶131}** We find the death penalty is also proportionate when Cassano's case is compared with cases involving persons who were previously convicted of purposeful killings. See, e.g., *State v. Cowans* (1999), 87 Ohio St.3d 68, 717 N.E.2d 298; *State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82; *State v. Carter*, 64 Ohio St.3d 218, 594 N.E.2d 595; *State v. Davis* (1992), 63 Ohio St.3d 44, 584 N.E.2d 1192; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373; and *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140.

**{¶132}** Accordingly, the judgment of the court of common pleas is affirmed.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment only.

———————————

James J. Mayer, Jr., Richland County Prosecuting Attorney, and John R. Spon, Jr., Assistant Prosecuting Attorney, for appellee.

David L. Doughten and John P. Parker, for appellant.

———————————