[Cite as *State v. Phillips*, 2014-Ohio-3670.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO.  16-13-09

    v.

ROGER A. B. PHILLIPS,             O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Wyandot County Common Pleas Court
Trial Court No. 12-CR-0050

**Judgment Affirmed**

**Date of Decision:   August 25, 2014**

APPEARANCES:

    *Shane M. Leuthold* **for Appellant**

    *Jonathan K. Miller*  **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Roger Adam Blake Phillips ("Phillips") brings this appeal from the judgment of the Common Pleas Court of Wyandot County, Ohio, sentencing him to eight years in prison after a jury convicted him of aggravated burglary, a felony of the first degree in violation of R.C. 2911.11(A)(1). Phillips challenges his conviction based on sufficiency and manifest weight of the evidence. He further asserts that his trial counsel was ineffective. He also argues that the trial court erred by denying his motions for acquittal and for a new trial, as well as by imposing a sentence that was more severe than the sentences imposed on his accomplices. For the reasons that follow, we affirm the trial court's judgment.

*Statement of Facts*

{¶2} On April 4, 2012, in Carey, Ohio, Mrs. Cleo Turnbell ("Mrs. Turnbell"), a seventy-nine-year-old widow, who lived alone on Crabapple Drive, was awakened in the early morning hours by the sound of something falling in her house. When she got up to check on the origin of the noise, she discovered a man with a flashlight in her utility room. She started screaming and the intruder appeared before her. He was wearing a dark hooded sweatshirt, a face mask, and gloves, and he was carrying a gun. The intruder asked Mrs. Turnbell for money and immediately after obtaining it, he fled through the door leading to her garage.

Case No. 16-13-09

Mrs. Turnbell then realized that the intruder had broken in through her garage door, took the money from her car, and then entered the house through the door leading to the house from the garage. She also noticed that, in addition to the garage door, her front door had been opened from the inside and left wide open. Other rooms in her house bore signs of an intrusion and money was missing from her desk. She called 911 and reported the incident.

**{¶3}** During an investigation following the incident, the police recovered physical evidence, including an empty Red Bull can, a pair of rubber gloves, and a shoe impression on a white bank envelope from which the money was taken. The scene was photographed. The investigation revealed that more than one intruder was in Mrs. Turnbell's residence on the morning of April 4, 2012. Initially, two individuals were charged for their involvement in this crime, Brendan Hoffman ("Hoffman") and Jeremy Ritter ("Ritter"). The two admitted that they were responsible for the offense and they revealed that they had one more accomplice. The two men implicated Phillips in the crime and agreed to testify against him in exchange for more beneficial sentences for them.

**{¶4}** An indictment by the grand jury against Phillips was filed on August 28, 2012, charging him with aggravated burglary, a felony of the first degree in violation of R.C. 2911.11(A)(1). (R. at 1.) Phillips was arrested on the same day and arraigned on August 29, 2012. He pled not guilty and received the assistance

of an appointed attorney, Todd A. Workman. (R. at 9.) On January 22, 2013, attorney Merle R. Dech Jr. entered his appearance as counsel for Phillips, substituting for attorney Workman. (R. at 25.) The matter went to trial by jury. The testimony relevant to the issues raised by Phillips on appeal can be summarized as follows.

*State's Case in Chief*

*Mrs. Turnbell*

{¶5} Mrs. Turnbell testified about her recollection of the night in question. She recalled that as she walked into her kitchen to investigate the source of the noise in her house, she realized that someone was in there and she started screaming, "What do you want? What are you doing in my house?" (Trial Tr. at 111.) She then described the following,

> And so here comes this person all masked, hooded mask. He walked right past my refrigerator and appeared and said, "Put your hands in the air." I said, "I will, I will, I will." I started screaming, begging, "Please don't hurt me. Please don't hurt me." I saw he had a gun in his left hand.
>
> And he said, "I'm not going to hurt you." He said, "Just tell me"— he said, "All I want is your money. Just tell me where you keep it." And I said, "Well, all I have is what's in my wallet." Little did I know they were already in the two bedrooms and got what they wanted. And so I said, "Well, I'll give you what's in my wallet." So he backed up, and we went right down—there is one step down into my family room. And the picture you saw was my purse hanging on the arm of my chair where I usually kept it. I got my wallet out, and it was dark. I couldn't see what I was giving him, because I had

> night lights on.  And he assured me twice that he wasn't going to hurt me; he just wanted my money.

(*Id.* at 112.)  Mrs. Turnbell then testified that the offender kept the gun in view so that she could see it.  (*Id.* at 113.)  When asked by the prosecutor whether she felt threatened by it, she responded, "Well, yes.  That's why I was begging for my life."  (*Id.*)  She stated that "[b]y this time, [she] didn't see a flashlight.  [She] just saw the gun."  (*Id.* at 130.)  She described the gun as black but not a revolver type.  (*Id.* at 113-115.)

{¶6} Mrs. Turnbell only saw one intruder, who was of small build and approximately her height, which was about 5 feet and 6 inches.  (*Id.* at 115, 131, 136.)  She thought the individual's weight was about "155 or something," but she admitted that she initially had indicated that the intruder weighed about 180 pounds.  (*Id.* at 115, 131-132, 135.)  Referring to the discrepancy, Mrs. Turnbell explained, "I said he was small, small built [sic].  I knew he wasn't a big person."  (*Id.* at 115.)  Mrs. Turnbell testified that the intruder was wearing a dark hooded sweatshirt, a mask that covered all of his face except for the eyes, and black gloves.  (*Id.* at 115, 132.)  The individual's voice was young, but she did not recognize it.  (*Id.* at 114, 130, 133, 135.)  She admitted, however, that in her initial statement to the police, she had indicated that the intruder's voice sounded like she had heard it before and she had suspected an individual called Dustin Dyer.  (*Id.* at 135-136.)

**{¶7}** Mrs. Turnbell testified that after she had given the offender the money, he left without physically harming her. (*Id.* at 114.) Although the intruder left through the door leading to her garage, she noticed that her front door had been unlocked and left standing open. (*Id.* at 106, 114, 133.) As Mrs. Turnbell was waiting for the police, she was looking out of her utility door glass, and in the driveway across the street, she saw a man with a hooded sweatshirt on, whose clothes resembled the individual she had seen in her house. (*Id.* at 125-126.) Mrs. Turnbell found a footprint on one of the empty bank envelopes left on the floor and she reported it to the police. (*Id.* at 119.)

**{¶8}** Mrs. Turnbell testified that she had known Phillips through his parents. Phillips and his father had done her yard work in the past, but the most recent service by them was about four years before the burglary. (*Id.* at 136-137.)

*Jeremy Ritter*

**{¶9}** Ritter testified that he was incarcerated and was serving six years as a result of the burglary in Mrs. Turnbell's house. (*Id.* at 145-146.) He also admitted to having prior felony convictions for trafficking in drugs. (*Id.* at 162.) Ritter testified that he had been a friend of Phillips for a number of years. (*Id.* at 145.) He disclosed that he had agreed to testify against Phillips about his involvement in the crime in exchange for a reduced sentence for himself; but he denied trying to "frame" Phillips. (*Id.* at 162, 171.)

{¶10} Ritter testified that the burglary was Phillips' idea and he first heard about it when he was drinking with Hoffman in Findlay. (*Id.* at 145-147.) According to Ritter, Phillips told them that there was a lot of money in Mrs. Turnbell's residence and that he knew exactly where it was. (*Id.* at 151.) That same night, Hoffman and Ritter went to Ritter's house, which was also on Crabapple Drive. (*Id.* at 147-148.) Phillips joined them and brought a book bag with two guns in it. (*Id.* at 149.) Ritter testified that one of the guns was a black BB gun, which looked like a semi-automatic weapon, and the other one, Ritter was "pretty sure" was "a .38," a revolver. (*Id.* at 149-150.) According to Ritter, Hoffman took the BB gun and Phillips took the other gun into the burglary, while Ritter did not have any weapons with him. (*Id.* at 150, 165-166, 171.)

{¶11} They got ready at Ritter's house by putting "gloves on and stuff," and putting socks over their shoes in order to cover up the footprints. (*Id.* at 148, 150-151.) Ritter had a mask on and a pair of Cleveland Brown winter gloves. (*Id.* at 150.) He stated that one of the other men had latex gloves on but he did not remember whether it was Phillips or Hoffman. (*Id.* at 150.) He later said that Hoffman was the one wearing blue latex gloves. (*Id.* at 171.)

{¶12} Ritter stayed in the garage during the burglary, while Phillips and Hoffman rifled through Mrs. Turnbell's car and then went inside the house, with Hoffman leading the way. (*Id.* at 153-154, 156, 166-167.) After about five or ten

minutes, Ritter heard a scream and he heard someone yell "put your hands up." (*Id.* at 157.) He also heard someone say, "Get the fuck down." (*Id.* at 167.) He did not know whose voice he had heard. (*Id.* at 157.) He ran out of the garage door, and ran back to his house through backyards. (*Id.* at 157, 168.) He saw that Hoffman was already 30 to 40 feet in front of him, although Hoffman did not come out through the garage door with him. (*Id.* at 157-158.) He later clarified that Hoffman was 30 to 40 *yards* ahead of him. (*Id.* at 168.) Ritter was "pretty sure" that Hoffman had left the house through the front door. (*Id.* at 158.) Ritter testified that Hoffman "was stopped behind a shed," hiding and waiting for him to catch up. (*Id.* at 169.) He caught up to Hoffman and the two men ran into Ritter's house. (*Id.* at 158-159.) Ritter recalled that, as they were running by Snyder Park where Crabapple Drive ends, a black truck drove by. (*Id.* at 171-172.) Hoffman and Ritter waited at Ritter's house for Phillips, who took longer to get back. (*Id.* at 158-159.)

{¶13} Ritter testified that after the robbery, he disposed of evidence. (*Id.* at 154-155, 161, 170.) He was nervous about getting caught and was worried that someone would recognize him, given his considerable height and weight. (*Id.* at 159.) He later learned that someone had seen him running down his street at about 5:00 or 5:30 that morning. (*Id.* at 159.) Ritter testified that he had met with

Phillips and Phillips' father at some point to "talk about what happened," meaning "the crime, itself." (*Id.* at 160.)

{¶14} Ritter admitted that after being arrested, he talked to Hoffman through the vents in Wyandot County Jail. (*Id.* at 172.) He acknowledged that he had not come forward to the police about the facts of this crime until about three or four months after his incarceration. (*Id.*)

*Brendan Hoffman*

{¶15} Brendan Hoffman testified that he was in prison for a number of charges, including six years for the burglary of Mrs. Turnbell's residence. (*Id.* at 209.) Hoffman admitted that he had entered into an agreement for a sentence recommendation so that sentences for all his convictions would run concurrently, which was very beneficial to him. (*Id.* at 230-231.) He came forward with evidence about this case to "try to make amends." (*Id.* at 209.)

{¶16} Hoffman's testimony in many respects confirmed Ritter's version of events. Some of their statements differed, however. Hoffman testified that it was all three of them who came up with the idea to burglarize Mrs. Turnbell's home after "a source" told them that there was a large amount of money there. (*Id.* at 210-211.) On cross-examination, Hoffman confirmed that he had previously told Lieutenant Frey that Phillips was the alleged source because he knew about the money being at Mrs. Turnbell's residence after having mowed her grass. (*Id.* 215-

216.) Similarly to Ritter, Hoffman testified that he was in Findlay with Ritter when the idea came up, and then went to Carey to Ritter's house, where they "suited up and headed over to Snyder Park where Cleo Turnbell lives." (*Id.* at 211.)

{¶17} Hoffman confirmed Ritter's testimony regarding preparations at his garage and claimed that he wore a black zip up, socks over his shoes, a mask, and blue rubber gloves. (*Id.* at 212, 214.) He claimed that Phillips also wore latex gloves. (*Id.* at 222.) Hoffman denied having a gun or anything that could look like a gun, but confirmed that Phillips had a black BB gun. (*Id.* at 212, 219, 222.) He testified that the only gun he saw that night was the BB gun. (*Id.* at 229.) Hoffman testified that prior to the robbery, he had drunk from a Red Bull can, which he threw away, and which was later found by the police. (*Id.* at 214, 221-222, 229-230.) He claimed that he had shared the drink with Phillips. (*Id.*)

{¶18} Hoffman admitted that he and Phillips went into Mrs. Turnbell's house, while Ritter stayed in the garage for a lookout. (*Id.* at 212.) He admitted that he had taken money from the bank envelope that was later found on the floor in Mrs. Turnbell's house, and that it was his footprint that was found on the bank envelope. (*Id.* at 217, 221.) He heard someone in the house say "Freeze bitch," and when he heard Mrs. Turnbell scream, he ran away through the front door, leaving it open, without checking what had happened. (*Id.* at 212-213, 220-221.)

He ran around the house and saw Ritter who had left through the back door and was already running too. (*Id.* at 227.) Hoffman passed Ritter and ran ahead of him, straight to Ritter's house. (*Id.* at 213, 227-228.) He denied hiding in a shed on the way. (*Id.* at 228.) Hoffman remembered seeing a pickup truck on the way to Ritter's house. (*Id.* at 229.)

{¶19} Hoffman testified that after the crime, he spoke to Phillips about it, "but not much," and they encouraged each other to keep this all secret." (*Id.* at 231-232.) Phillips told him, however, that he had talked about the crime to his father, who was a former police chief. (*Id.* at 232.)

{¶20} Hoffman admitted that although the burglary at Mrs. Turnbell's house was his first, he did "a couple more" afterwards. (*Id.* at 225.) He was apprehended by Lieutenant Frey on April 10, 2012. (*Id.* at 225.) He did not talk to Lieutenant Frey about Phillips at that time. (*Id.* at 226.) During the trial, Hoffman did not remember statements that he had made to Lieutenant Frey; he claimed that he had been "really high on drugs" at the time. (*Id.* at 225-226.) He did remember reading a statement in his discovery pack indicating that he had implicated another individual, Jeremy Walters, in the burglary. (*Id.* at 226.) He admitted that he did not mention Phillips until August 2012, after he "had taken care of other matters," and before proceedings on this case against him started.

- 11 -

(*Id.* at 226-227.) Hoffman tried to keep Phillips' name "out of this as long as [he] could." (*Id.* at 232.)

**{¶21}** Hoffman admitted that after his arrest, he talked to Ritter through the vents of Wyandot County Jail. (*Id.* at 223.) He also wrote a letter to Phillips from jail, in which he requested Phillips to provide him with drugs. (*Id.* at 224.) Phillips did not bring the drugs to him. (*Id.* at 224-225.)

*Kyle Shaw*

**{¶22}** Kyle Shaw ("Shaw"), who grew up next to Phillips "for like twenty years," testified that he had sold Phillips a black BB gun, which looked like a semi-automatic pistol, sometime in the end of March or early April 2012. (*Id.* at 176.) The sale occurred before the burglary at issue. (*Id.* at 177.) He admitted that he had stolen the BB gun from Walmart before selling it to Phillips. (*Id.* at 178.) He also admitted that he had been convicted of grand theft motor vehicle and of arson in 2006. (*Id.* at 177.) He contended that he was telling the truth on the stand. (*Id.* at 178.)

*Deputy Christopher Verhoff*

**{¶23}** Deputy Christopher Verhoff ("Deputy Verhoff"), who was a Carey police officer at the time of the burglary, testified about his investigation of the incident and about the evidence obtained as a result. (*Id.* at 179.) He testified that after receiving a call about the burglary, he patrolled the general area prior to

going to Mrs. Turnbell's house. (*Id.* at 197-198.) During that time, he came into contact with Richard Siefert ("Siefert"), who had flagged him down and volunteered information about what he had seen that morning. (*Id.* at 198.) Based on the information learned from Siefert, Deputy Verhoff developed one suspect, Ritter. (*Id.* at 199.) He asked Siefert to submit a written statement as to what he had seen that morning. (*Id.* at 208.) Siefert never submitted a statement in spite of Deputy Verhoff's attempts to obtain one from him. (*Id.* at 208.)

{¶24} After talking to Siefert, Deputy Verhoff went to Mrs. Turnbell's residence, where he learned that the suspect was about 5'7" tall, approximately 180 pounds, and had a gun in his left hand. (*Id.* at 200.) Mrs. Turnbell thought that she had heard the intruder's voice before and she thought it belonged to one Dustin Dyer. (*Id.* at 202-203.) Deputy Verhoff remained in contact with Mrs. Turnbell after the initial investigation and he later learned that the weight of the suspect was more like 160 pounds rather than 180 pounds. (*Id.* at 205.)

{¶25} Deputy Verhoff located "a couple foot tracks" leading away from the home. (*Id.* at 181.) It appeared to be two sets of footprints leading away from the garage door, "where the home was broken into," into the grass behind the residence. (*Id.* at 181, 203.) He found several items, which were located along the path from Mrs. Turnbell's residence to Ritter's home, including a Red Bull can and blue latex gloves. (*Id.* at 182-185.) Deputy Verhoff testified that the two

rubber gloves were different in shape, one was "more extended" while the other one was more "crumpled up." (*Id.* at 188.) No fingerprints or tool marks were found in the residence. (*Id.* at 190.) The DNA found on the Red Bull can and the gloves implicated Hoffman. (*Id.* at 195.)

**{¶26}** There was a partial fingerprint on the Red Bull can, which did not match Phillips' fingerprints. (*Id.* at 194.) Testifying about the shoe impression found on the bank envelope, Deputy Verhoff confirmed that it was consistent with the shoes and socks obtained from Hoffman. (*Id.* at 193.) Deputy Verhoff testified that Phillips' home was located very close to Ritter's home, stating, "possibly the backyards are catty-corner to each other." (*Id.* at 185-186.)

### *Motion for Acquittal*

**{¶27}** At the end of the State's case in chief, the defense moved for an acquittal pursuant to Crim.R. 29, asserting that the State had not put forth enough evidence to sustain a conviction. (Tr. at 242.) The trial court overruled the motion and the defense proceeded with its case in chief.

### *Defendant's Case in Chief*

### *Richard Siefert*

**{¶28}** Siefert testified that he had known Phillips for over twenty years; he also knew Phillips' father. (*Id.* at 246-247.) He lived by Phillips' house in April 2012. On April 4, 2012, Siefert came home from work at about 1:00 a.m. and

stayed up for the rest of the night. (*Id.* at 248.) He was outside of his house at around 6:00 in the morning, waiting to take his son to his brother-in-law. (*Id.* at 247-249.) He testified that "[t]he windows had frosted that morning, so [he] went out and started the truck about 20 till 6." (*Id.* at 249.) It was dark outside and he was standing about 75-80 feet away from Phillips' house. (*Id.* at 250, 252-253.) Siefert testified, "I looked up because the lights are never on over there that early in the morning. That morning they were on." (*Id.* at 249.) He saw Phillips "walking from the fridge to the kitchen table putting stuff on the table like he was getting something to eat that morning." (*Id.* at 249-250.) This was at about 5:40 in the morning. (*Id.* at 250.) He also saw Phillips' mother and sister at the kitchen table. (*Id.*) Siefert further testified that as he was getting into his vehicle at about 6:05 that morning, he saw Phillips on the front porch of his house letting the dogs out, and he waved to him. (*Id.* at 249-250.)

{¶29} The defense admitted into evidence a photograph depicting Phillips' house in the early morning hours, as seen from where Siefert was standing in the morning on April 4, 2012, which was a reasonable depiction of the lighting conditions on the date. (*Id.* at 251-253, 257; Def.'s Ex. A.) The photograph visibly showed Phillips standing in his kitchen, where the lights were on, illustrating for the jury Siefert's ability to observe into Phillips' kitchen without obstructions. (*Id.*)

- 15 -

{¶30} After observing the scene, Siefert left his home around 6:00 or 6:05 a.m. and drove to his brother-in-law's home. (*Id.* at 248, 253-254.) As he drove his '91 Chevy pickup truck down Crabapple Drive, he saw two men "coming across the field from Crabapple and the old Snyder Park over to the new one." (*Id.* at 253-254.) Siefert recognized one of the men due to his considerable size, and identified him as Jeremy Ritter. (*Id.* at 254-255.) As he was driving "uptown," he saw "all the police officers headed down toward the house and the area there." (*Id.* at 254.) He dropped off his son and after he got back on the road about fifteen minutes later, he saw a police officer and told him about the two men he had seen, identifying one of them as Ritter. (*Id.* at 254-255.) He also told the officer that the two men "went right down to Jeremy's house." (*Id.* at 255.) He went home after that and saw Phillips and his father loading their pickup truck. (*Id.* at 255-256.) He went to bed after that. (*Id.* at 256.)

{¶31} Following the event, Siefert was contacted by the police with a request to fill out a report regarding his statements to the police officer on April 4, 2012. (*Id.* at 256.) He responded, "I told you everything I know. I'll think about filling it out." (*Id.*) Siefert testified that when the police came again to ask about the report, "it made [him] mad, so [he] didn't fill it out." (*Id.* at 256.)

{¶32} On cross-examination, Siefert stated that he had known about Phillips facing burglary charges since August 2012, when he had seen it in the

papers. (*Id.* at 260.) In spite of that, he never contacted the law enforcement to tell them that he had seen Phillips that morning in his house. (*Id.*)

*Roger Phillips*

**{¶33}** Defendant's father, Roger Phillips ("Roger"), testified that he ran a lawn and snowplow service, in which he employed his son. (*Id.* at 262-263.) He admitted that he and his son had been to the Turnbell residence numerous times, but the last time they worked there was about five years prior to trial. (*Id.* at 270-271, 273.) Roger confirmed that Phillips was friends with Hoffman and Ritter, but he denied ever speaking with either Hoffman or Ritter personally. (*Id.* at 270.)

**{¶34}** Roger testified that on April 4, 2012, he got up shortly after five in the morning and woke up Phillips, who was sleeping in his bedroom, so they could get ready for work. (*Id.* at 263, 273.) His wife and his daughter, Tammy Risner, were up that morning when he woke up. (*Id.* at 272.) Roger testified that Phillips did not leave the house at all between waking up and packing the pickup truck to go to work. (*Id.* at 273.) Later that morning, Roger noticed multiple police cruisers "going up and down the side streets and [his] street." (*Id.* at 263.)

**{¶35}** Roger testified that in the morning of April 4, 2012, he and Phillips mowed all athletic fields at Hopewell Loudon School, which was about 17 acres. (*Id.* at 265-268.) Roger testified that it took approximately 35 to 40 minutes to get there from his house and it was an all-day job, which had to be started "as close to

7 o'clock as possible." (*Id.*) Although he did not know for certain what time he got to Hopewell that morning, he stated that they always started there at around 7:00. (*Id.* at 271.) An invoice depicting charges for mowing Hopewell Loudon School by Roger's business that day was submitted into evidence. (*Id.* at 265-268; Ex. B.) On cross-examination, Roger acknowledged that the invoice submitted as Exhibit B did not have any times on it and that the times given by him in his testimony were approximate. (*Id.* at 269.)

{¶36} Roger admitted that he never explained to law enforcement what his son did on April 4, 2012. (*Id.* at 270.) He did not prepare any written statements about the events of that day. (*Id.*)

*Brenda Phillips*

{¶37} Brenda Phillips ("Brenda"), defendant's mother, testified that she assisted Roger in bookkeeping for his business and preached at a Christian radio station about once a month. (*Id.* at 274-275.) She had prepared the invoice that was submitted as Exhibit B. (*Id.* at 275-276.) Brenda testified that Phillips was about 5'10" tall and he weighed about 140 pounds. (*Id.* at 281.) He worked with his father every day in the lawn care service. (*Id.* at 280.) Brenda confirmed that Mrs. Turnbell had been a customer of her husband's business in the past. (*Id.* at 280.)

{¶38} Brenda remembered the morning of April 4, 2012, because there had been a lot of police around the area that morning. (*Id.* at 279.) She testified that on the night of April 3, 2012, her family had a "game night" and multiple people participated until late, including her niece Randy Guzman, her daughter Tammy, her daughter Chelsea, and Phillips, who was home that night. (*Id.* at 276-277.) Brenda testified that Phillips went to bed for a couple of hours, but she was still up, playing games when he got up a little after five in the morning. (*Id.* at 277.) She testified that Phillips came to the table and had his breakfast; he also let the dogs out that morning. (*Id.* at 278.) After that, he got dressed and went to load the equipment on the truck. (*Id.* at 279.)

{¶39} On cross-examination, Brenda confirmed that there were about two hours during the night, when Phillips was not involved in the games. (*Id.* at 282.) She explained that he went to his bedroom and could not have left the house without her seeing him. (*Id.* at 283.) When asked by the State, Brenda confirmed that her husband was convicted of felony theft in January 2005. (*Id.* at 283.)

*State's Rebuttal*

{¶40} After Brenda's testimony, the defense renewed its motion for acquittal, which was denied. The defense then rested and the State presented rebuttal witnesses.

*Tamara J. Risner*

{¶41} Tamara J. Risner ("Tamara"), Phillip's sister, confirmed that she was at Phillips' parents' residence in the early morning hours of April 4, 2012. (*Id.* at 285-286.) She testified that Phillips came home around 2:00 or 3:00 o'clock in the morning wearing a gray sweatshirt and saying that he had been at Ritter's. (*Id.* at 286.) She claimed that Phillips was home for the rest of the night and she did not see him leave again. (*Id.* at 288.) Tamara remembered being interviewed by Lieutenant Frey and Angela Fultz, but denied telling them that Phillips "came running into the front door of the house" in the middle of the night or early morning hours. (*Id.* at 287.) She denied telling them that Phillips "was sweating, his hair was wet, and that he had sweat running down his face." (*Id.* at 289.)

*Lieutenant Todd Frey*

{¶42} Lieutenant Todd Frey ("Lieutenant Frey"), from the Wyandot County Sheriff's office, testified that he had interviewed Tamara about the events of April 4, 2012. (*Id.* at 289-290.) He prepared a written report concerning that interview, which he had brought with him to the stand. (*Id.* at 290.) During the interview with Lieutenant Frey Tamara did not specifically mention the times 2:00 or 3:00 a.m., but she stated that Phillips "had come in the door, front door" in the middle of the night or early morning hours of April 4, 2012. (*Id.*) According to the report, Phillips "had sweat running down his face" and "his hair was wet."

(*Id.*) Phillips told her that he had come from Ritter's house and he then went to his bedroom. (*Id.* at 290-291.) After that, "she observed cops go by the house." (*Id.* at 291.)

*Deputy Verhoff*

**{¶43}** Deputy Verhoff testified again and explained that he had come into contact with Siefert between approximately 6:25 and 6:30, after he had responded to the call about the burglary at 6:19 a.m. (*Id.* at 293.) Siefert was coming from the direction of his home, rather than going toward his home at that time. (*Id.*) Deputy Verhoff also stated that he had not observed any frost on windshields or the grass in the morning of April 4, 2012. (*Id.* at 294.)

*Eric Risner*

**{¶44}** Eric Risner ("Eric"), Phillips' brother-in-law, was allowed to testify for the purpose of impeachment. He heard his wife Tamara talk about that night, saying that Phillips was sweating and that "he was probably out jogging." (*Id.* at 297-298.) He observed Phillips burning "a little brown bag" the following day on the porch. (*Id.* at 298.) Several days later, he observed Roger carrying out "stuff that was wrapped up in a tablecloth," which he described as "big things." (*Id.*)

*Rebuttal by the Defense*

**{¶45}** Roger was called by the defense and asked whether he remembered carrying anything out with tablecloth or moving any big objects around April 4

through 7, 2012. (*Id.* at 300.) Roger denied doing anything like that. (*Id.*) Roger stated that he used to have guns in the home in the past, "but not for the last ten years." (*Id.*) Although he had a gun cabinet, it was empty and just used as storage. (*Id.* at 301.)

*Conclusion of the Trial and Post-Trial Proceedings*

**{¶46}** The defense renewed its motion for acquittal, which was again denied by the trial court. The jury returned a unanimous verdict, finding Phillips guilty of aggravated burglary. (R. at 71.) The court ordered a presentence investigation and continued the matter for sentencing. (R. at 73.)

**{¶47}** Before the sentencing in this case occurred, Phillips filed "Motion for Judgment of Acquittal Rule 29 or in the Alternative Rule 33 Motion for New Trial." (R. at 77.) This document was filed by Phillips pro se, although it does not appear that attorney Merle Dech had been discharged at that point. (*See* R. at 75.) As evidence in support of his motion, Phillips attached several documents that had not been submitted into evidence previously.

**{¶48}** Attorney Dech withdrew as counsel of record in this matter and Phillips filed multiple other documents pro se. (*See* R. at 81, Ex. A; R. at 88, 89.) He included additional exhibits, including letters, statements, and affidavits, which had not been provided to the trial court before, and which concerned alleged

irregularities during proceedings in the trial court.[1]  (*See, e.g.*, R. at 81, Ex. A; R. at 90, Ex. B, C.)   The trial court assigned Phillips' motions for a hearing and appointed another attorney, Shane Leuthold, to represent Phillips at the hearing. (*See* R. at 95, 97.)

**{¶49}** On August 19, 2013, the trial court conducted a hearing on Phillips' motion for acquittal and the alternative motion for a new trial.  The trial court denied both motions and sentenced Phillips to eight years in prison.  (R. at 110.) From that ruling Phillips now appeals raising the following as his assignments of error.

> **FIRST ASSIGNMENT OF ERROR: THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTION OF AGGRAVATED BURGLARY**
>
> **SECOND ASSIGNMENT OF ERROR: THE CONVICTION [FOR] AGGRAVATED BURGULARY [sic] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE**
>
> **THIRD ASSIGNMENT OF ERROR: COUNSEL FOR THE DEFENDANT PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL**
>
> **FOURTH ASSINGMENT [sic] OF ERROR: THE COURT ERRED BY OVERRULING THE APPELLANT'S MOTION FOR RULE 29 DIRECTED AQUITTAL [sic]**
>
> **FIFTH ASSINGMENT [sic] OF ERROR: THE COURT ERRED BY OVERRULING THE DEFENDANT'S MOTION**

---

[1] Not all of the arguments made in Phillips' trial court motions are before us on appeal.  Therefore, we express no opinion on the arguments concerning irregularities at the arraignment, jury selection, and the trial, which were alleged in the trial court's motions but are not raised here.

**FOR NEW TRIAL PURSUANT TO CRIMINAL RULE OF PROCEDURE 33**

**SIXTH ASSINGMENT [sic] OF ERROR: THE TRIAL COURT ERRED BY SENTENCING THE APPELLANT TO A TERM OF INCARCERATION OF EIGHT YEARS AND TRIAL TAXED HIM FOR EXERCISNG [sic] HIS RIGHT TO A JURY TRIAL**

### *1. First Assignment of Error—Sufficiency of the Evidence*

**{¶50}** In his first assignment of error, Phillips asserts that the evidence was insufficient to convict him of aggravated burglary. Under the indictment filed in this case, the State was required to prove that on or about the fourth day of April 2012, Phillips by force, stealth, or deception, trespassed, by knowingly entering or remaining on the land or premises of Mrs. Turnbell, without privilege, when Mrs. Turnbell was present, with purpose to commit a criminal offense there, *and that Phillips inflicted, or attempted or threatened to inflict physical harm on Mrs. Turnbell.* (R. at 1, Indictment.) Phillips does not challenge all of the elements of the crime at issue. In this assignment of error Phillips only challenges the element concerning infliction and attempt or threat to inflict physical harm, as required by the indictment and by R.C. 2911.11(A)(1). Arguing that there is no evidence of any threat taking place, Phillips claims that the aggravating element is missing and demands reversal of his conviction.

**{¶51}** When reviewing a criminal case for the sufficiency of the evidence, "our inquiry focuses primarily upon the adequacy of the evidence; that is, whether

the evidence submitted at trial, if believed, could reasonably support a finding of guilt beyond a reasonable doubt." *In re Willcox*, 3d Dist. Hancock No. 5-11-08, 2011-Ohio-3896, ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We look at the evidence in the light "most favorable to the prosecution" and we will affirm the conviction if "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118. Importantly, this test raises a question of law and does not allow us to weigh the evidence. *In re Willcox* at ¶ 10. "In essence, sufficiency is a test of adequacy"— i.e., whether the evidence is legally sufficient to sustain a verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386.

{¶52} Phillips relies on the parts of Mrs. Turnbell's testimony where she quoted the intruder as saying that he was not going to hurt her, to argue that there can be no finding of threat. He asserts that the intruder's assurances that he was not going to hurt Mrs. Turnbell contradict the threat element. For that reason, he argues that the evidence was insufficient to convince an average mind beyond a reasonable doubt that the threat of harm occurred.

{¶53} Nevertheless, Mrs. Turnbell testified that the intruder kept his gun constantly in her view and asked her for the money. The Ohio Supreme Court has recognized that,

> [o]ne cannot display, brandish, indicate possession of, or use a deadly weapon in the context of committing a theft offense without conveying an implied threat to inflict physical harm. It is the very act of displaying, brandishing, indicating possession, or using the weapon that constitutes the threat to inflict harm because it intimidates the victim into complying with the command to relinquish property without consent.

*State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 23. Therefore, for the purpose of conviction for aggravated burglary a defendant's act of brandishing a weapon "is legally sufficient to support the jury's finding of a threat of physical harm." *State v. Brewer*, 2d Dist. Montgomery No. 24109, 2011-Ohio-2966, ¶ 14. The fact that the defendant subsequently assures the victim that they will not hurt her, "does not negate the existence of the threat," because "[o]nce [the defendant] brandished the weapon, a threat to inflict physical harm had occurred." *Id.*

**{¶54}** Further in support of the threat element, Hoffman and Ritter both testified that they had heard the orders given to Mrs. Turnbell and heard her scream. (*Id.* at 157, 167, 212, 219-221.) Ritter specifically testified that he had heard a scream and a yell "put your hands up," although he did not know whose voice it was. (*Id.* at 157.) He also heard someone say "Get the fuck down." (*Id.* 167.) Hoffman heard someone yell "Freeze bitch" and he heard Mrs. Turnbell scream. (*Id.* at 220-221.)

{¶55} Therefore, there is sufficient evidence to conclude that the intruder brandished a weapon at Mrs. Turnbell and otherwise intimidated her into being submissive. The intruder's actions, as described by the State's witnesses, and viewed in the light most favorable to the prosecution, can certainly be construed as threatening Mrs. Turnbell with physical harm, in spite of his assurances to the contrary.

{¶56} We recognize that Mrs. Turnbell never identified Phillips as the intruder who brandished the weapon at her. Yet, both Hoffman and Ritter testified that Phillips was the third person in Mrs. Turnbell's house on the night in question and no other people were alleged to be present during the encounter with Mrs. Turnbell. (Trial Tr. at 149, 156, 210, 212.) Both accomplices testified that Phillips had a gun going into Mrs. Turnbell's residence. Hoffman testified that Phillips had the black BB gun going into the burglary. (*Id.* at 212, 219.) There was also testimony of Phillips' acquaintance, Kyle Shaw, who had sold Phillips the black BB gun, which looked like a semi-automatic pistol, sometime in the end of March or early April 2012. (*Id.* at 176.)

{¶57} Furthermore, although the State did not provide the three men's physical descriptions, the trial court pointed out that the jury was able to view them and recognize that neither Hoffman nor Ritter matched the description of the intruder given by Mrs. Turnbell. (*See* R. at 110, J. Entry, Aug. 22, 2013.) Mrs.

Turnbell described the intruder as being approximately 5 feet and 6 inches tall and weighing about 155 or 160 pounds, although she initially claimed that the weight was something about 180 pounds. In his testimony, Hoffman acknowledged that Ritter is "kind of a big guy," while he (Hoffman) is "a little bit lighter." (*Id.* at 227-228.) Under the standard for reviewing sufficiency of the evidence, looking at the evidence in the light most favorable to the prosecution, this provided sufficient evidence for the jury to conclude that Phillips was the person brandishing a weapon in Mrs. Turnbell's house and otherwise threatening her on April 4, 2012.

{¶58} For all of the above reasons, we overrule Phillips' first assignment of error, which challenges the sufficiency of the evidence for the threat of harm element of aggravated burglary.

### 2. Second Assignment of Error—Manifest Weight of the Evidence

{¶59} In this assignment of error, Phillips does not dispute any of the elements of aggravated burglary. Rather, he claims that because of his multiple alibi witnesses, doubtful credibility of the State's witnesses, and lack of physical evidence placing him on the scene, the jury could not have reasonably found *him* guilty beyond a reasonable doubt. Here, Phillips challenges his involvement in this crime as being against the manifest weight of the evidence.

**{¶60}** The question of manifest weight of the evidence concerns an "effect in inducing belief." *Thompkins*, 78 Ohio St.3d at 387. Therefore, it is not subject to a mathematical analysis. *Id.* When reviewing a conviction challenged for the manifest weight of the evidence, an appellate court acts as a "thirteenth juror" and may disagree with the jury's resolution of the conflicting testimony. *Id.*, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). But the appellate court must give due deference to the findings of the jury, because

> [t]he fact-finder occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.

(Alteration omitted.) *State v. Dailey*, 3d Dist. Crawford, No. 3-07-23, 2008-Ohio-274, ¶ 7, quoting *State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist.1998). Therefore, an argument that a conviction is against the manifest weight of the evidence will only succeed if the appellate court finds that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶61} Both sides presented evidence relevant to the issue of Phillips' involvement in the crime and his presence at Mrs. Turnbell's residence on the night in question. As cited above, the State provided evidence implicating Phillips in the crime through the testimony of Hoffman and Ritter. The two gave details of the crime, which were in many ways consistent with the testimony of Mrs. Turnbell and with the results of the investigation conducted by the police.

{¶62} Phillips points to some irregularities in Hoffman and Ritter's depictions of the crime, such as the discrepancy regarding whether Hoffman had a gun or whether he waited for Ritter behind the shed. (App't Br. at 7-8.) Yet, in spite of the variations in Hoffman and Ritter's testimony in describing some details of the crime, both were consistent in stating that Phillips told them about the money in Mrs. Turnbell's residence, that Phillips was with them that night and he had a gun, that Phillips and Hoffman entered Mrs. Turnbell's house while Ritter waited in the garage, and that Phillips stayed in Mrs. Turnbell's residence after the two had fled. (Trial Tr. at 149-151, 153-156, 158-159, 212, 215-216, 219, 222.) The jury was allowed to sort through the evidence and determine whether in view of the prior criminal history of the witnesses and the discrepancies in their testimony, Hoffman and Ritter's statements about Phillips' involvement in the crime were believable. Unlike us, the jurors heard and saw Hoffman and Ritter at trial and had additional indicia of the witnesses'

truthfulness, such as their behavior at trial, "body language," "voice inflections," "hand gestures," "interplay between the witness and the examiner," and their "reaction to exhibits and the like." *Dailey*, 2008-Ohio-274, at ¶ 7. We do not find that the discrepancies in the two accomplices' testimonies were so significant as to render their statements utterly unreliable and the jury's reliance on them, unreasonable.

{¶63} Phillips alleges that Hoffman and Ritter could not be trusted because they had criminal records and "were willing to lie and say whatever they could to get a good deal." (App't Br. at 6.) We note that the jury was instructed that Hoffman and Ritter's testimony "should be viewed with great suspicion and weighed with great caution." (Trail Tr. at 343.) The trial court further instructed the jury that they were "not required to believe the testimony of any witness simply because he or she was under oath" and that they had to "determine what testimony is worthy of belief and what testimony is not worthy of belief." (*Id.* at 342.) It does not appear that the jury disregarded these instructions.

{¶64} Hoffman and Ritter's testimony regarding Phillips' involvement in the crime was corroborated by other witnesses. For example, Shaw testified that he had sold Phillips a BB gun shortly before the burglary. Tamara stated that Phillips came home in the early morning hours on April 4, 2012, saying that he had been at Ritter's house. Lieutenant Frey testified about Tamara's prior

statement that Phillips had come home that night sweaty, shortly before the police went by their house. Mrs. Turnbell testified about the height and weight of the intruder. Those features were similar to Phillips' characteristics, as given by Phillips' mother. Furthermore, as noted by the trial court, the jury could observe Phillips and consider whether his appearance matched the descriptions given by Mrs. Turnbell. (*See* R. at 110, at 3.)

{¶65} Phillips further argues that the evidence at trial contradicted Hoffman and Ritter's testimony about his involvement in the crime. For example, Mrs. Turnbell saw only one intruder and Siefert saw only two individuals coming from Crabapple Drive on the night in question. Apart from Hoffman and Ritter, no other witness attested to three individuals being involved in the crime. He claims that the police investigation did not reveal involvement of a third individual either, because there were only two sets of foot tracks leading from Mrs. Turnbell's house. He emphasizes the fact that no physical evidence places him on the crime scene. While multiple pieces of evidence pointed to Hoffman being present at Mrs. Turnbell's house, and a witness saw Ritter close to the crime scene, nothing implicated Phillips, other than the testimony of the two criminals. He further points to the fact that the forensic tests only found Hoffman's DNA on the Red Bull can, although Hoffman testified that Phillips had drunk from it too.

{¶66} Nevertheless, there was circumstantial evidence corroborating Hoffman and Ritter's testimony, as detailed above. Furthermore, the front door found open after the burglary corroborates Hoffman and Ritter's statements that Hoffman ran through the front door; while the two sets of foot tracks leading from the garage indicate that two more individuals used that avenue of escape, showing that there were at least three intruders in Mrs. Turnbell's house. "Circumstantial evidence and direct evidence have the same probative value." *State v. Adams*, 3d Dist. Crawford No. 3-06-24, 2007-Ohio-4932, ¶ 21, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. Therefore, while the jury was allowed to infer a reasonable doubt from the lack of direct physical evidence placing Phillips on the scene, its reliance on Hoffman and Ritter's testimony and on the circumstantial evidence to infer Phillips' involvement in the crime beyond a reasonable doubt was not prohibited.

{¶67} Phillips claims that he had multiple alibi witnesses—Siefert and his parents saw him at home during the time when the burglary was taking place. (App't Br. at 9.) Nevertheless, as the State pointed out to the jury, all three of these witnesses waited until the day of trial to disclose the alibi, rather than make the statements to the police earlier to exculpate Phillips, even though they knew that Phillips had been charged with this crime in August 2012.

**{¶68}** Phillips argues that Siefert and his family members' statements were more credible than Hoffman and Ritter's. Nevertheless, Siefert's testimony, or at least his recollection of the order and timing of the events, was called into question by the statements of Deputy Verhoff, who stated that Siefert was coming from the direction of his home, rather than going toward his home at the time when he talked to him at about 6:30 in the morning. Deputy Verhoff also contradicted Siefert's claim that there was frost on the windshields on the morning of April 4, 2012, which would require Siefert to go outside of his house twenty minutes prior to 6:00 a.m. to warm up his car. Siefert's refusal to make a written statement to the police, in spite of multiple requests to do so, might also have affected the jury's receptiveness to his testimony at trial.

**{¶69}** Roger and Brenda's testimony that Phillips was at home all night was directly contradicted by their daughter Tamara's testimony, who saw Phillips come home from Ritter's house at some time in the early morning hours of April 4, 2012. In turn, Tamara's testimony that Phillips was home on April 4, 2012, since around 2:00 or 3:00 in the morning, was undermined by Lieutenant Frey and her husband Eric, both testifying that Tamara gave prior inconsistent statements about that night. Roger's credibility was undermined in other ways as well. Ritter claimed that he had met with Roger and talked to him about the crime, but Roger

testified that he had never talked to Ritter. Roger's wife indicated that Roger had a prior felony theft conviction.

**{¶70}** Although Phillips claims that his witnesses were more credible than Hoffman and Ritter, we do not find that the jury lost its way in believing Hoffman and Ritter rather than Siefert, Roger, and Brenda. The jury, as the trier of facts, "may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Davis*, 3d Dist. No. 9-06-56, 2007-Ohio-4741, ¶ 40. The alibi testimony presented by defense witnesses was undermined in multiple ways, while Hoffman and Ritter's testimony regarding Phillips' participation in the burglary was corroborated by other evidence and by Tamara and Eric's testimony.

**{¶71}** Phillips claims that he could not have committed the crime because he went to work at Hopewell Loudon School, which was located about 35-40 minutes away from Phillips' house, and that he left shortly after 6:00 to be there by 7:00 a.m. Nevertheless, an invoice introduced as a proof of this fact merely showed that Roger's business performed yard work at Hopewell Loudon School on April 4, 2012. The invoice did not exhibit the time at which the work started and it did not show that Phillips was actually the person performing the work on that day. Furthermore, the invoice was prepared by Phillips' mother, whose credibility was undermined by her own daughter's testimony. In addition, the

invoice, even if believed by the jury, did not contradict their finding that Phillips was at Mrs. Turnbell's residence prior to 6:19 a.m. Phillips could have been involved in the burglary, which had occurred prior to 6:19 a.m., when it was reported to Deputy Verhoff, and still have gone to Hopewell Loudon School, which was located about 35-40 minutes away, to work there at approximately 7:00 a.m.

{¶72} Although the trial transcript shows many deficiencies in both parties' versions of events, we cannot say that the jury clearly lost its way in resolving conflicts in evidence and finding that Phillips was involved in the burglary of Mrs. Turnbell's residence. Therefore, the conviction was not against the manifest weight of the evidence and the second assignment of error is overruled.

### 3. Third Assignment of Error—Ineffective Assistance of Counsel

{¶73} In his third assignment of error, Phillips asserts that his trial counsel, Mr. Dech, was ineffective in several respects, which we discuss separately below in parts a-c of this assignment of error. In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must first show that the counsel's performance was deficient in that it fell "below an objective standard of reasonable representation." *State v. Keith*, 79 Ohio St.3d 514, 534, 684 N.E.2d 47 (1997). Second, the defendant must show "that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Id.*, citing

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to demonstrate prejudice, the defendant must prove a reasonable probability that the result of the trial would have been different but for his or her counsel's errors. *Id.* In applying these standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 108, quoting *Strickland*, 466 U.S. at 669. Therefore, the court must be highly deferential in its scrutiny of counsel's performance. *State v. Walker*, 90 Ohio App.3d 352, 359, 629 N.E.2d 471 (3d Dist.1993), quoting *Strickland*, 466 U.S. at 689.

### *a. Failure to Remove a Juror*

**{¶74}** As his first claim under this assignment of error, Phillips alleges that his counsel was ineffective by failing to remove a member of the jury. During the examination of the jury, the prosecutor asked many questions, including whether anyone of the prospective jurors had done any investigation on their own or had heard anything about this case. (Trial Tr. at 33-34.) The prosecutor then read a list of potential witnesses in the case, asking whether any of the jurors knew the witnesses and whether they would be able to judge their testimony impartially and fairly. (*Id.* at 36.) The defense counsel asked, among others, whether the jury would follow the instructions of the trial court and consider the case carefully,

holding the State to its burden of proof, and whether they could be fair jurors to Phillips as well as to the State. (*Id.* at 48, 51.) After the defense had exercised all of its peremptory challenges, Ms. Lynn Payton was called in to the jury box. The trial court and the two attorneys had an opportunity to question her as a prospective juror. The following exchange occurred:

> THE COURT: Lynn, now that you're up there, do you wish you would have responded to any of the questions?
> MS. PAYTON: No.
> THE COURT: Okay. Mr. Miller.
> MR. MILLER: Ms. Payton, can you judge this case and base a verdict on the evidence that you here [sic] within the four walls of this courtroom?
> MS. PAYTON: Yes.
> MR. MILLER: Nothing further.
> THE COURT: Mr. Dech.
> MR. DECH: Thank you. Ms. Payton, do you feel you could be a fair and impartial juror in this case?
> MS. PAYTON: I do.
> MR. DECH: And if we were to reverse the roles, would you want someone in your present mental disposition to sit as a juror in this case?
> MS. PAYTON: Sure.
> MR. DECH: Okay. And you'll uphold the State of Ohio to its burden of proof?
> MS. PAYTON: Yes.
> MR. DECH: And if they don't prove this case beyond a reasonable doubt, your finding must be not guilty. You can follow that?
> MS. PAYTON: Yes, I can.
> MR. DECH: Okay. If you see anybody, can you say—if you make a finding of not guilty, you'll stand by it; you wouldn't be reluctant about it?
> MS. PAYTON: Yes.
> MR. DECH: Okay. Is there any reason you would not be a fair and impartial juror in this case?
> MS. PAYTON: No.

MR. DECH: Okay. Thank you.

THE COURT: Ms. Payton I would be remiss if I did not bring this out. You work in the Clerk of Court's office, correct?

MS. PAYTON: Yes, I do.

THE COURT: Papers involving this case have been filed through that office?

MS. PAYTON: I'm involved in the paper flow, yes.

THE COURT: Has there been anything that has come through your hands about this case or been said about this case in your presence that sticks with you that would influence you one way or the other?

MS. PAYTON: I don't believe so.

THE COURT: So you're assuring us you could be fair and impartial?

MS. PAYTON: I think so.

THE COURT: Okay. Pass for cause?

MR. MILLER: Yes, Your honor.

THE COURT: Mr. Dech?

MR. DECH: I pass for cause, too.

(*Id.* at 68:6-70:13.)

**{¶75}** In his brief, Phillips speculates that the defense counsel did not know about Ms. Payton's occupation prior to the trial judge bringing it to his attention and that Ms. Payton "chose to withhold this information." (*See* App't Br. at 11-12.) The record does not support this speculation. Nevertheless, even assuming that the defense counsel was indeed unaware of Ms. Payton's employment at the Clerk of Court's office and that his performance was deficient for not informing himself about her occupation ahead of time, there is no prejudice alleged or shown by this fact. The trial court disclosed Ms. Payton's occupation in open court and the defense counsel had an opportunity to question her about her ability to judge this case.

{¶76} Phillips alleges that the trial counsel "didn't even notice that Lynn Payton had affixed her signature on the indictment itself," to certify that it was "a full, true and correct copy of the original Indictment." (App't Br. at 13; *id.* Ex. A.) We note that the indictment provided in the record does not have Ms. Payton's signature affixed to it. (R. at 1.) Yet, assuming that Ms. Payton's signature did appear on the indictment's certification, there is no support for the allegation that the trial counsel "didn't even notice" it, or that he was deficient in this respect. Furthermore, as the trial court noted in its judgment entry denying Phillips' motions for acquittal and for new trial, there could have been no prejudice from Ms. Payton's signing of the indictment. (R. at 110, J. Entry at 6-7.) Ms. Payton attested that she was not familiar with the case. But, even if she had read the indictment previously, she would not have obtained any knowledge outside of the record because, as the trial court noted, the indictment was a public record and was read to the entire jury during the trial. (*Id.*; Trial Tr. at 344-345.)

{¶77} Phillips alleges that the defense counsel was ineffective "for not at least trying to have [Ms. Payton] removed for cause." (App't Br. at 13.) In order to win a challenge based on ineffective assistance due to the trial counsel's failure to "at least try" to remove Ms. Payton for cause, Phillips would have to show (1) the trial counsel's failure to "at least try" fell below an objective standard of reasonable representation. *See Keith*, 79 Ohio St. 3d at 534. He then would have

to show a reasonable probability that (2) the result of the trial would have been different had the trial counsel "at least tried" to remove Ms. Payton for cause. *See id.* Phillips fails to do so.

**{¶78}** We have previously repeatedly held that a prospective juror will not be excused from a criminal trial for cause by a virtue of his or her employment with the State of Ohio where no bias by the juror is shown. *State v. Sims*, 20 Ohio App.2d 329, 332, 253 N.E.2d 822 (3d Dist.1969); *see also State v. Allsup*, 3d Dist. Hardin No. 6-10-09, 2011-Ohio-404, ¶¶ 46-52. Even the fact that the juror is a state employee and knows witnesses or attorneys involved in the case does not render the juror automatically biased against the criminal defendant. *State v. Stockton*, 3d Dist. Shelby No. 17-96-15, 1997 WL 232245, *5 (May 5, 1997). In order to excuse a juror for cause, something more is needed. A list of possible causes for juror challenges is provided in R.C. 2313.17 and Crim.R. 24.[2] Phillips does not assert that any of those causes existed in this case.

---

[2] R.C. 2313.17 states,

(B) The following are good causes for challenge to any person called as a juror:

(1) That the person has been convicted of a crime that by law renders the person disqualified to serve on a jury;

(2) That the person has an interest in the cause;

(3) That the person has an action pending between the person and either party;

(4) That the person formerly was a juror in the same cause;

(5) That the person is the employer, the employee, or the spouse, parent, son, or daughter of the employer or employee, counselor, agent, steward, or attorney of either party;

(6) That the person is subpoenaed in good faith as a witness in the cause;

(7) That the person is akin by consanguinity or affinity within the fourth degree to either party or to the attorney of either party;

(8) That the person or the person's spouse, parent, son, or daughter is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against any such party to another such action;

**{¶79}** Phillips alleges no bias stemming from Ms. Payton's occupation or the fact that her signature appeared on the certification to the copy of the original indictment. Ms. Payton admitted that she was involved in the paper flow in the

(9) That the person discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court.
(C) Each challenge listed in division (B) of this section shall be considered as a principal challenge, and its validity tried by the court.
(D) In addition to the causes listed in division (B) of this section, any petit juror may be challenged on suspicion of prejudice against or partiality for either party, or for want of a competent knowledge of the English language, or other cause that may render the juror at the time an unsuitable juror. The validity of the challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased.

Crim.R. 24(C) states that a "person called as a juror may be challenged for the following causes:"
(1) That the juror has been convicted of a crime which by law renders the juror disqualified to serve on a jury.
(2) That the juror is a chronic alcoholic, or drug dependent person.
(3) That the juror was a member of the grand jury that found the indictment in the case.
(4) That the juror served on a petit jury drawn in the same cause against the same defendant, and the petit jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside.
(5) That the juror served as a juror in a civil case brought against the defendant for the same act.
(6) That the juror has an action pending between him or her and the State of Ohio or the defendant.
(7) That the juror or the juror's spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against the juror.
(8) That the juror has been subpoenaed in good faith as a witness in the case.
(9) That the juror is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.
(10) That the juror is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted; or to the defendant.
(11) That the juror is the person alleged to be injured or attempted to be injured by the offense charged, or the person on whose complaint the prosecution was instituted, or the defendant.
(12) That the juror is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney, of any person included in division (C)(11) of this rule.
(13) That English is not the juror's native language, and the juror's knowledge of English is insufficient to permit the juror to understand the facts and the law in the case.
(14) That the juror is otherwise unsuitable for any other cause to serve as a juror.

Clerk of Court's office, but she did not believe that she had been exposed to any information that would give her special prior knowledge of this case. During the trial, the court stated for the record that the evidence, which was filed and sealed by the clerk's office, was not given to Ms. Payton to file. (Trial Tr. at 189.) The defense counsel confirmed his understanding of that fact and stipulated to it. (*Id.*)

{¶80} The trial counsel could have reasonably relied on Ms. Payton's answers to multiple questions from the trial court, the prosecution, and from himself, where Ms. Payton indicated that she did not know anything about the case and she could be fair and impartial. Accordingly, the defense counsel's failure to "at least try" to remove her for cause is not sufficient to rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Cassano*, 2002-Ohio-3751, at ¶ 108.

{¶81} Phillips does not provide any law to support even the possibility that the trial court would have removed Ms. Payton from the jury for cause had defense counsel requested it. The Second District Court of Appeals was faced with an allegation of ineffective assistance of counsel were the trial attorney allowed a juror employed as a deputy clerk in the county's municipal court to serve on a jury. *State v. McKinney*, 80 Ohio App.3d 470, 609 N.E.2d 613 (2d Dist.1992). That appellate court refused to infer prejudice and bias so as to render the clerk "an unfit juror," without any assertion that the clerk had prior knowledge

of the case. *Id.* at 476-477. Similarly, in spite of the possibility that Ms. Payton had signed the certification of the indictment in her professional capacity, Phillips *does not allege that she had any prior knowledge of the case*. Conversely, the transcript of the jury voir dire reflects that Ms. Payton was not familiar with the case.

**{¶82}** Moreover, there is no prejudice, alleged or shown, from Ms. Payton's participation in the jury deliberations. "Neither the Ohio Rules of Civil Procedure nor the Ohio Revised Code contains a provision that a court employee is presumed to be biased as a juror. See R.C. 2313.42 [recodified as RC 2313.17]; Crim.R. 24." *McKinney*, 80 Ohio App.3d at 476; *accord State v. Saunders*, 4th Dist. Ross No. 1896, 1993 WL 524968, *7-8 (Dec. 1, 1993) (rejecting a claim that a juror employed as a deputy clerk of courts in the same county's juvenile court or a juror employed as assistant to the warden at a correctional institution should automatically be rendered "biased against a criminal defendant"). The burden of showing a juror's bias is upon the challenger. *State v. Warner*, 55 Ohio St.3d 31, 47, 564 N.E.2d 18 (1990), quoting *Reynolds v. United States*, 98 U.S. 145, 157, 25 L.Ed. 244 (1878). Phillips does not allege that Ms. Payton's occupation or her signature on the certification page for the indictment influenced her or the jury in any way, resulting in the finding of guilty. The voir dire examination of Ms. Payton does not reveal any bias or prejudice against Phillips. On the contrary, Ms.

Payton repeatedly assured the court, the prosecutor, and the defense counsel that she could be impartial and that she would follow the law in this case.

**{¶83}** Therefore, even if the defense counsel had requested removal of Ms. Payton for cause, there is no reasonable probability that the trial court would have granted the request and no reasonable probability that the result of the jury deliberations would have been different. In view of these facts and the lack of any indication of bias, we reject Phillips' argument that his trial counsel was ineffective by failing to remove Ms. Payton from the jury.

### b. Failure to Request a Copy of Hoffman and Ritter's Grand Jury Testimony

**{¶84}** Phillips argues that his trial counsel was ineffective because he had not ordered the transcript of Hoffman and Ritter's grand jury testimony. We reject this allegation for several reasons.

**{¶85}** Phillips does not submit why the grand jury testimony was essential to his defense and does not even allege that the grand jury testimony would have revealed anything that would support his acquittal. He argues that the defense counsel should have requested the grand jury testimony because if he had, the State would have been required to turn it in under Crim.R. 16. (App't Br. at 14.) Of note, Phillips does not allege that the grand jury testimony would have showed inconsistencies in Hoffman and Ritter's stories. Rather he suggests that the trial counsel should have obtained Hoffman and Ritter's grand jury testimony to

"compare it to their original statements to police as well as what they said at trial." (*Id.*) This statement, in itself, shows that Phillips' allegation of ineffective assistance must fail, as the claim that "the result of the trial would have been different" if the trial counsel had requested the grand jury testimony, is completely speculative. *See Keith*, 79 Ohio St. 3d at 534.

{¶86} Furthermore, the inconsistencies in Hoffman and Ritter's accounts of the events on April 4, 2012, were revealed at trial and weighed by the jury. As stated above, those inconsistencies did not go to the elements of aggravated burglary or to the issue of Phillips' involvement in the crime. The jury was informed that the two accomplices had prior criminal records and were offered more beneficial sentences in exchange for their testimony against Phillips. The jury was then instructed on how to weigh their testimony. The claim that the grand jury testimony would have further undermined their credibility in such a manner that the jury would have acquitted Phillips does not amount to "a reasonable probability that the result of the trial would have been different." *Keith*, 79 Ohio St. 3d at 534.

{¶87} Accordingly, Phillips cannot satisfy a claim of ineffective assistance of counsel based on the alleged failure to request a copy of the grand jury testimony.

*c. Failure to Object or Call Witnesses*

**{¶88}** As his next contention under this assignment of error, Phillips asserts that the trial counsel should have objected to the State's question directed to Brenda about Roger's 2005 conviction for felony theft. "[F]ailure to object to error, alone, is not enough to sustain a claim of ineffective assistance." *State v. Campbell*, 69 Ohio St.3d 38, 52-53, 630 N.E.2d 339 (1994), quoting *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). "Because 'objections tend to disrupt the flow of a trial, and are considered technical and bothersome by the fact-finder,' competent counsel may reasonably hesitate to object in the jury's presence." (Alterations omitted.) *Id.* at 53, quoting Jacobs, Ohio Evidence (1989), at iii-iv.

**{¶89}** Like with the prior arguments regarding the counsel's deficiency, Phillips fails to show how this alleged error deprived him of a fair trial. Even if the trial counsel had objected to the State's question and Brenda's testimony about Roger's 2005 conviction had not been heard by the jury, Roger's truthfulness was otherwise undermined by Tamara, Eric, and Ritter, who gave statements contradicting Roger's various declarations. Roger's testimony as an alibi witness was further undermined by the fact that he had waited for months to disclose the purported alibi, while knowing about his son facing charges for this felony since August 2012.

{¶90} Under this assignment of error Phillips also claims that his defense counsel failed to "call important witnesses." (App't Br. at 14.) No argument is provided to support this claim so as to rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," or to show that the result of the trial would have been different if the trial counsel had called more witnesses, raised more objections, or provided more evidence. *Cassano*, 2002-Ohio-3751, at ¶ 108, quoting *Strickland*, 466 U.S. at 689; *Keith*, 79 Ohio St. 3d at 534.

{¶91} For all of the foregoing reasons, Phillips' third assignment of error is overruled.

### 4. *Fourth Assignment of Error—Motion for Acquittal*

{¶92} Phillips' argument in his fourth assignment of error, states, in its entirety

> The facts and arguments for a Rule 29 motion for directed acquittal have been set forth under the assignments of error for sufficiency and manifest weight of the evidence. Appellate counsel incorporates those arguments as fully restated herein.

(App't Br. at 15.) In response to this legal argument, based upon our previous discussion of the first and second assignment of error, we overrule the fourth assignment of error.

### *5. Fifth Assignment of Error—Motion for New Trial*

**{¶93}** In support of his contention that his motion for new trial should have been granted, Phillips asserts two grounds under Crim.R. 33: (1) misconduct of the jury due to the inclusion of Ms. Payton on the jury panel, and (2) prosecutorial misconduct due to the State allegedly allowing perjured testimony at trial. *See* Crim.R. 33(A)(2).

**{¶94}** As to the first claim, no misconduct of the jury has been alleged or proved. We have already discussed above that no basis for excluding Ms. Payton from the jury has been provided to the trial court and no evidence about Ms. Payton's bias or improper effect on the jury has been revealed. With respect to the second claim, Phillips continues to argue that Hoffman and Ritter lied on the stand and alleges that the State engaged in misconduct by offering their testimony, which the State allegedly knew to be false.

**{¶95}** The Ohio Supreme Court held that, a prosecutorial misconduct and a denial of due process occurs when the state knowingly uses false or perjured testimony "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001), quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). In order to prove the denial of due process as a result of prosecutorial misconduct, the defendant must show that "(1) the statement was actually false;

(2) the statement was material; and (3) the prosecution knew it was false." *Id.*; *see also State v. Snyder*, 3d Dist. Seneca No. 13-12-38, 2013-Ohio-2046, ¶ 43, quoting *State v. Twyford*, 94 Ohio St.3d 340, 355, 763 N.E.2d 122 (2002) ("In assessing the existence of prosecutorial misconduct, we are mindful that 'the touchstone of this analysis is the fairness of the [proceeding], not the culpability of the prosecutor.' "). Under this standard, we hold that there was no due process violation and Phillips is not entitled to new trial.

{¶96} On appeal, Phillips does not specify which of the purportedly false statements were intentionally introduced by the State in spite of its alleged knowledge that they were not true. His pro se motion in the trial court, however, alleged that the State engaged in misconduct by failing to impeach Hoffman, who had supposedly previously stated that he had carried a .32 pistol during the robbery on Mrs. Turnbell's residence, but then testified differently at trial. (R. at 77 at 5, 32, 35). We note that there is no evidence that Hoffman or Ritter lied on the stand. No proof has been introduced that Hoffman did indeed carry a gun into the burglary or that the State knew about it and allowed Hoffman to testify that he did not have a gun.

**{¶97}** Phillips relies on statements that he claims had been made, but were not before the trial court,[3] such as "brag[ging] to a fellow inmate" or giving prior inconsistent statements in a recorded interview. (R. at 77, at 5, 32; App't Br. at 17.) These statements, even if true, would not warrant a reversal of Phillips' conviction because they were not material to his prosecution. The statements did not concern any of the elements of the crime, or Phillips' involvement in the burglary. Although Phillips might argue that pointing out another inconsistency in Hoffman's testimony would have resulted in jury's disbelieving his statement about Phillips' involvement in the crime, both accomplices were subject to cross-examination and were asked about their prior inconsistent statements. Their credibility was challenged multiple times by the defense counsel through pointing out that they had had prior felony convictions and had agreed to testify against Phillips in exchange for more beneficial sentences. Hoffman's testimony that he did not have a gun during the burglary was undermined by Ritter's testimony to the contrary. We therefore cannot say that the State's failure to correct Hoffman's answer regarding his use of a gun during the burglary would have changed the jury's evaluation of his credibility. *See Iacona*, 93 Ohio St.3d at 97 (reaching similar conclusion where the state failed to correct its witness's answer that was contrary to facts).

---

[3] After trial, Phillips moved to supplement the trial court's record with CDs of, what he had claimed to be, interviews of Hoffman and Ritter. (R. at 114.) The trial court denied the request and therefore, this evidence is not before us. (*See* J. Entry, Sept. 17, 2013.)

{¶98} Concluding, Phillips fails to satisfy any of the three elements required for a new trial based on prosecutorial misconduct and he does not show any misconduct by the jury. Accordingly, his motion for new trial was properly denied and his fifth assignment of error is overruled.

### 6. Sixth Assignment of Error—Improper Sentencing

{¶99} In this assignment of error, Phillips does not allege that his sentence was improper under the statutory guidelines. Rather, he claims that it was too harsh when compared to the sentences received by Hoffman and Ritter. Phillips asserts that the circumstances of the crime were the same for all three offenders and the victim suffered one, indivisible harm as a result of the burglary. He further highlights the fact that unlike Hoffman and Ritter, he had no prior criminal record. He contends that in view of these facts, the discrepancy between his sentence and sentences of his accomplices can only be explained as a " 'trial tax[]' for exercising his constitutional right to a jury trial," and is unconscionable. (App't Br. at 18-19.)

{¶100} Phillips cites *City of Columbus v. Bee*, where the Tenth District Court of Appeals reversed a sentence imposed by the trial court, upon finding that the lower court had ignored the sentencing guidelines in arbitrarily imposing the maximum allowed penalty "as a price of ignoring the court's plea bargaining recommendation." 67 Ohio App.2d 65, 425 N.E.2d 409 (10th Dist.1979),

paragraph 2 of the syllabus. The facts of *Bee* were significantly different than Phillips' case and his reliance on the opinion of the Tenth District Court of Appeals in requesting reversal is meritless. In *Bee*, the trial court participated in the plea negotiations and indicated "that probation was a possibility if there was a plea of no contest (and therefore no trial), but would probably not be given if [the defendant] went to trial and was convicted." *Id.* at 74. The defendant "ultimately received the maximum sentence *without any consideration of statutory sentencing guidelines*," which made it "clear that [she] was penalized for insisting on a trial." (Emphasis added.) *Id.* at 74-75. Here, the record does not reflect that any plea negotiations took place and no allegations are made that the trial court participated in such negotiations. Phillips did not receive the maximum sentence for the crime, which was up to eleven years. R.C. 2929.14. The record reflects that the trial court did consider the statutory sentencing guidelines. (*See, e.g.*, R. at 109, at 3-4; Sentencing Tr.) Therefore, there is no support for Phillips' assertion that his case is similar to *Bee* and that he was penalized for going to trial.

{¶101} We previously rejected an allegation that a trial court was imposing "a trial tax" when it sentenced a defendant to a longer prison term than the term given to his companions who pled guilty to the same crime. *See State v. Shoe*, 3d Dist. Hancock No. 5-92-12, 1992 WL 380267, *2 (Dec. 16, 1992). In *Shoe*, we reiterated the standard for reviewing the trial court's sentence, holding that "a

reviewing court 'cannot invade the province of the trial court by setting aside a sentence [imposed within statutory guidelines] if there is no clear showing that the trial court abused its discretion.' " *Id.*, quoting *Bee*, 67 Ohio App.2d at 77. Phillips does not allege that his sentence was contrary to the statutory guidelines and it appears that the record supports the trial court's analysis of those guidelines. Accordingly, we follow our reasoning in *Shoe* and reject Phillips' contention that he was "trial taxed" merely because he received a harsher sentence than his accomplices.

{¶102} We further note that although Phillips claims that all three offenders committed the same crime, the record does not reflect whether Hoffman and Ritter were charged with the same offense, being aggravated burglary, a felony of the first degree. Hoffman and Ritter's sentencing transcripts are not before us and we will not speculate about the trial court's reasoning when imposing the six-year prison terms on them. We note, however, that although all three offenders participated in the same crime, each of them was involved in a different way. According to the testimony found by the jury to be true, Phillips was the only one who actually faced the victim and threatened her by brandishing the weapon in front of her. He was the only one who did not flee the scene when Mrs. Turnbell started screaming. Also, as the trial court noted in its sentencing judgment entry, Phillips "was the only one who had a connection, no matter how remote, to this

victim." (R. at 109, J. Entry at 3.) Therefore, his actions had more serious impact on Mrs. Turnbell than the actions of Hoffman and Ritter.

**{¶103}** Concluding, no facts support Phillips' contention that he was penalized for exercising his right to a jury trial. Because no irregularities appear with respect to Phillips' sentencing, we hold that the trial court did not abuse its discretion in sentencing Phillips to eight years in prison and we overrule the sixth assignment of error.

*Conclusion*

**{¶104}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued herein. The judgment of the Common Pleas Court of Wyandot County, Ohio is therefore affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur.**

**/jlr**